RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0086p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LENA MCCLAIN,

    *Plaintiff-Appellant,*

  *v.*

NORTHWEST COMMUNITY CORRECTIONS CENTER
JUDICIAL CORRECTIONS BOARD,

    *Defendant-Appellee.*

No. 05-3154

---

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 00-07648—James G. Carr, Chief District Judge.

Argued: February 2, 2006

Decided and Filed: March 6, 2006

Before: NELSON, DAUGHTREY, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Catherine H. Killam, Sylvania, Ohio, for Appellant. Thomas M. Green, GREEN & GREEN, Dayton, Ohio, for Appellee. **ON BRIEF:** Catherine H. Killam, Sylvania, Ohio, R. Michael Frank, ARNOLD & CARUSO, Toledo, Ohio, for Appellant. Thomas M. Green, GREEN & GREEN, Dayton, Ohio, for Appellee.

---

## OPINION

---

  ROGERS, Circuit Judge. Plaintiff-Appellant Lena McClain appeals the district court's grant of summary judgment in favor of the defendant-appellees on her various due process and employment-discrimination claims. McClain, an African-American female, was employed as a Resident Specialist Coordinator (RSC) at NorthWest Community Corrections Center. Early in her employment she learned that she was making less money than a Caucasian male RSC and complained to her boss at a staff meeting. A few weeks later, after some complaints regarding her communication skills and inability to implement the philosophy of the corrections facility, McClain was fired. McClain was fired before the end of her 120-day probationary period.

  McClain sued NorthWest Community Corrections Center Judicial Corrections Board, NorthWest Community Corrections Center, the Center's Executive Director James Wichtman, the Center's Program Director Rodney Fizer, and the Center's Operations Director Pamela Gunter-

Fearheiley (collectively referred to as "NorthWest") in federal district court. She claimed, among other things, that NorthWest had violated her right to due process under state law and under the Federal Constitution, discriminated against her in her terms of employment on account of her race and gender, and fired her for complaining about her disparate pay.

The district court held that McClain was entitled to notice and a hearing prior to her termination under state law but that state law did not create an implied private right of action. The district court also ruled that McClain's right to due process under state law did not create a property interest protected by the Federal Constitution. The district court later granted NorthWest summary judgment on all of McClain's discrimination and retaliation claims.

McClain now appeals, arguing four contentions: (1) Ohio law provides an implied private cause of action for violation of the applicable state regulation, (2) her right under Ohio law to due process creates a property interest that is protected by the Federal Constitution, (3) her disparate treatment claims (one for disparate pay and one for termination) should have survived NorthWest's motion for summary judgment, and (4) her retaliation claims should have survived NorthWest's motion for summary judgment. We affirm in part and reverse in part. Summary judgment was warranted in favor of NorthWest as to McClain's state and federal due process claims. However, summary judgment was not warranted on McClain's discrimination claims or her retaliation claims.

## I.

### Background

McClain was hired by NorthWest as an RSC on August 2, 1999, at a starting salary of $25,000. Serving five Ohio counties, NorthWest is a "community-based correctional facility" in which fifty to two hundred residents (i.e., inmates) reside and receive treatment. *See* Ohio Admin. Code § 5120:1-14-01(F). The duties of an RSC include overseeing the movement, transportation, control, and activities of the facility's residents in conformity with the established theories and practices of community-based corrections. From August until November 15, all staff members, including McClain, were preparing for the arrival of the residents. RSCs report to the Operations Director, Pamela Gunter-Fearheiley.

NorthWest's written offer of employment to McClain stated, "You will be required to serve an initial employment review period of 120 days. During this time your performance will be evaluated. Should your performance evaluation meet the standards as set by the program, you will be considered for continued employment." JA 189. Later, on or about October 20, 1999, NorthWest told its staff that "if you do your job, you'll have your job." JA 251. The Ohio Administrative Code § 5120:1-14-03(P) (Regulation P) in effect at the time of McClain's employment stated as follows:

> Persons hired to staff community-based correctional facilities and programs shall be unclassified employees of judicial corrections boards or contract providers. Each judicial corrections board shall develop and adopt personnel policies and procedures for hiring, promoting, demoting, suspending, and removing its employees. The personnel policies and procedures shall provide for due process and equal employment opportunity.

This regulation was passed pursuant to Ohio Revised Code § 5120.111(A), which mandates that the state department of rehabilitation and correction "[a]dopt rules . . . that serve as criteria for the operation of community-based correctional facilities and programs . . . ."

Around the time that NorthWest hired McClain, NorthWest also hired Dan McGee as an RSC. McGee is a white male, and he was hired with a starting salary of $27,000. The Executive Director of NorthWest, defendant James F. Wichtman, declared in his affidavit that McGee was paid

$2000 more because of his "additional computer responsibilities." JA 193. Wichtman also declared that McGee had "experience working in a community-based correction facility in Ohio" and that the "position of [RSC] was considered a salary negotiable position." JA 193-94. As an RSC, McGee also reported to Gunter-Fearheiley.

In her affidavit, McClain declares that, early in her employment, she complained "from time to time" to Gunter-Fearheiley about her salary. Gunter-Fearheiley told McClain that $25,000 was all that the RSC position paid, and Gunter-Fearheiley told McClain in the presence of McGee, "You both make the same amount. I wish I could pay you both more." JA 241. McClain also declares that Gunter-Fearheiley asked her to retrieve from NorthWest's computer files a sample letter offering employment. McClain chose the letter to McGee, and she then discovered that McGee received a starting salary of $27,000. When McClain informed Gunter-Fearheiley of her discovery, McClain claims that her boss "became furious" and explained that McGee received more money because he had experience with community-based corrections. McClain declared that no one at NorthWest had claimed prior to her discharge that McGee had additional computer responsibilities.

William Jones, then NorthWest's Clinical Coordinator, described McClain and Gunter-Fearheiley's relationship before McClain's discovery as "very pleasant." JA 264. He also described them as "tight." JA 264. Jones also declared that, as he continued to observe McClain and Gunter-Fearheiley interact after McClain confronted Gunter-Fearheiley, it appeared that Gunter-Fearheiley "was out to get McClain." JA 264.

On November 9, 1999, McClain was promoted to Senior RSC and received a $2000 salary increase. She received this promotion despite NorthWest's policy that "[u]sually an employee in review status is not promoted to another position." JA 481. There was never any job description for the Senior position, and McClain declared that Gunter-Fearheiley only told her to "continue what you've been doing." JA 242. The position of Senior RSC was abolished shortly thereafter on November 30, 1999. McClain, however, retained her pay increase and returned to her former position as an RSC. With her retained pay increase, McClain was making $2000 more than the two Caucasian men, Bruce Mort and Mark Hall, who had recently replaced McGee and another RSC.

McClain also produced the affidavit of Laurence McCarthy, a Caucasian man, who was offered, but ultimately declined, a position as a Senior RSC. He declared that he was "offered . . . $30,000 a year, base salary, plus $2,000 for computer work on [NorthWest's] Lotus Notes System, for a total of $32,000 a year." JA 238-39.

According to Wichtman, he received complaints about McClain before and after the arrival of the residents. McClain testified at her deposition that she heard from other co-workers that Gunter-Fearheiley had called McClain's co-workers on their day off to think about whether they had any problems with McClain, and she told them that they were going to have a "hats-off" meeting on December 13, 1999. A "hats-off" meeting allows employees to share their concerns about a particular employee, but it is not disciplinary in nature. At the meeting, McClain's co-workers told her that she was distant, had communication problems, and took credit for others' work. William Jones declared that Wichtman and Gunter-Fearheiley "dominated" the meeting. JA 264. Although McClain admitted at her deposition that she had communication problems with the staff, McClain refused to acknowledge the meeting in writing, as requested by her supervisors soon after the meeting.

On December 16, 1999, NorthWest gave her the option of resigning or being terminated. Upon McClain's request, NorthWest granted her administrative leave with pay to consult an attorney. She decided not to resign, so she was terminated on December 17, 1999, before the end of her 120-day probationary period. NorthWest told McClain that it fired her because of her "failure to maintain effective working relationships with associates and Coordinators . . . . Furthermore, [she]

demonstrated an inability to implement the philosophy and emotional support for . . . the therapeutic community . . . ." JA 195.

Although McClain was fired for reasons not deemed serious enough to require counseling, discipline, or criticism prior to the "hats-off" meeting, evidence in the record indicates that a Caucasian male employee with similar, yet more severe, misconduct was not fired. Fellow RSC Bruce Mort was disciplined several times during his probationary period. For instance, he defied orders, had overly familiar relationships with some of the residents, and undermined Resident Specialists who reported to him. NorthWest was also concerned about his attire at work, his purchase of a car from the father of a resident, and his sexual comments and behavior toward the residents. He also falsely signed "Bruce A. Mort, Supervisor" to an unauthorized letter sent to a judge on behalf of one of the residents, requesting that the charges against the resident be dismissed. He also refused to sign forms that his supervisor requested that he sign in response to his misconduct, and he refused to take responsibility for his misconduct. Mort was not fired after his misconduct.

*Procedural History*

Within ninety days after exhausting her administrative remedies, McClain filed a complaint on October 17, 2000, in federal district court. She named as defendants the corrections center, NorthWest Corrections Center Judicial Board, Wichtman, Gunter-Fearheiley, and Fizer. She alleged, among other things, racial and gender discrimination regarding the terms of her employment and termination, retaliatory discharge, and denial of due process. Her claims were brought under both federal and state law.

The district court certified the two following questions to the Supreme Court of Ohio:

(1) Is an employee of a judicial corrections board hired to the staff of a community based correctional facility an at-will employee who serves at the pleasure of the Board?

(2) Is an employee of a judicial corrections board hired to staff a community based correctional facility, who is subject to a 120 day initial review period pursuant to Board policy, entitled to "due process" in the termination of her employment pursuant to O.A.C. § 5120:1-14-03(P) and R.C. § 5120.111[?]

JA 100. The Supreme Court of Ohio responded on June 28, 2002. Although the supreme court declined to answer whether the employees were at will, it held, 6 to 1, that the employees were entitled to due process during the 120-day review period. *McClain v. NorthWest Cmty. Corr. Ctr.*, 769 N.E.2d 387 (Ohio 2002). Justice Lundberg Stratton dissented, arguing that Ohio Revised Code § 5120.111 did not bestow authority on the board to create rights not already existing under Ohio law. *Id.* at 388-90.

McClain then moved for partial summary judgment on her claim that her termination violated her right to procedural due process. The defendants filed a cross-motion for partial summary judgment. The district court granted McClain's motion and denied NorthWest's motion. The district court held that, although McClain could be fired without cause, she was entitled to notice of her impending termination and a meaningful opportunity to persuade the decision-maker not to terminate her employment. The district court also held that NorthWest's "hats-off" meeting was not sufficient process. In a later order in response to McClain's motion for attorneys' fees pursuant to 42 U.S.C. § 1988, the district court held that McClain's right to due process was a matter of only state law; her right to due process did not create a property interest protected by the Federal Constitution. *McClain v. NorthWest Cmty. Corr. Ctr.*, 323 F. Supp. 2d 834, 839 (N.D. Ohio 2004).

Following these rulings on due process, the district court granted NorthWest's motion for summary judgment, dismissing McClain's suit in its entirety, including her due process claim based on state law. The district court held that the Ohio regulation that provided employees such as McClain due process did not create an implied private right of action. The district court also held that the discrimination claims for disparate pay and for termination had to be dismissed because McClain had not presented sufficient evidence of pretext for racial or sexual discrimination to have her case go to a jury. The district court also dismissed McClain's retaliation claims. McClain now timely appeals.

## II.

We review de novo the district court's grant of summary judgment. *See United States v. Miami Univ.*, 294 F.3d 797, 805 (6th Cir. 2002). Summary judgment is appropriate only when no genuine issue of material fact exists and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We must view the facts contained in the record and draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We cannot weigh the evidence or determine the truth of any matter in dispute, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), because we determine only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party, *id.* at 248-49.

We conclude first that McClain is not entitled to damages or backpay for NorthWest's violation of McClain's right to due process under state law. Second, the district court correctly held that McClain does not have a property interest that is protected by the Federal Constitution. Third, McClain has created a genuine issue of material fact as to why she was paid less than McGee and as to why her employment was terminated. Finally, McClain has created a genuine issue of material fact as to whether NorthWest fired her because she complained of disparate pay. We therefore affirm in part and reverse in part.

## III.

Our best reading of unclear Ohio law leads us to the conclusion that Ohio law does not provide a private cause of action for damages or other monetary relief to employees of a community correctional facility who allege a denial of due process guaranteed by Regulation P. The version of Regulation P in effect at the time of McClain's employment stated as follows:

> Persons hired to staff community-based correctional facilities and programs shall be unclassified employees of judicial corrections boards or contract providers. Each judicial corrections board shall develop and adopt personnel policies and procedures for hiring, promoting, demoting, suspending, and removing its employees. The personnel policies and procedures shall provide for due process and equal employment opportunity.

This regulation was passed pursuant to Ohio Revised Code § 5120.111(A), which mandates that the state department of rehabilitation and correction "[a]dopt rules . . . that serve as criteria for the operation of community-based correctional facilities and programs . . . ." The right that McClain undoubtedly has under state law is perplexing. Regulation P states that she may be fired for any reason, but at the same time says she is entitled to some form of due process to contest an arbitrary termination. Although the Supreme Court of Ohio confirmed that McClain is entitled to due process under Regulation P, that court has not addressed whether Regulation P provides an implied private cause of action. "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Rector v. Gen. Motors Corp.*, 963 F.2d 144, 146 (6th Cir. 1992). Our review of the regulation and its history

convinces us that the Ohio courts would not infer a private cause of action for damages or other monetary relief.

The Supreme Court of Ohio has stated that it will not infer the existence of a private cause of action unless the Ohio General Assembly manifests a "clear implication" for private causes of action. *See Fawcett v. G. C. Murphy & Co.*, 348 N.E.2d 144, 147 (Ohio 1976). To determine whether there is a "clear implication," the Ohio Court of Appeals has considered three of the four factors that the Supreme Court of the United States enunciated in *Cort v. Ash*, 422 U.S. 66, 78 (1975), for determining whether a court should infer the existence of a private cause of action under federal law: (1) Was plaintiff a member of the class for whose especial benefit the statute was enacted? (2) Is there any indication of legislative intent either to create or deny such a remedy? and (3) Is inferring a remedy consistent with the underlying purposes of the legislative scheme? *Strack v. Westfield Cos.*, 515 N.E.2d 1005, 1007 (Ohio Ct. App. 1986). When considering these three factors, we must consider both the regulation at issue and the statute pursuant to which the regulation was passed. *See id.* These factors do not favor inferring the existence of a private cause of action for monetary relief.

First, as NorthWest concedes and the district court held, McClain was a member of the class for whose benefit Regulation P was enacted. "Due process" obviously protects the people to whom it is due. *See McClain*, 769 N.E.2d 387. Second, the parties have not pointed to, and we have not uncovered, any unambiguous legislative history concerning whether the Department of Rehabilitation and Correction in its regulation or the General Assembly in the organic act intended either to create or deny a private right of action.

The third factor—whether implying a private cause of action is consistent with the statutory scheme—is ultimately determinative in this case and demonstrates that Regulation P does not provide McClain with a private cause of action for money damages. First, the administrative history of the subsequent amendment of Regulation P states that the last sentence was deleted "[t]o clarify the rule and make it more consistent with existing law." The history continued, "A line has been deleted for clarity. Employees of CBCF's are not granted rights not already existing under applicable law." Ohio Admin. Code § 5120:1-14-03 (2003) (Rule Amendment Filings). This history reveals that the agency most likely did not intend a cause of action for damages, inasmuch as the agency apparently never intended to create a right to due process in the first place. Second, the community facilities' ability under Regulation P to discharge unclassified employees for any reason renders the computation of damages exceedingly difficult. It is unlikely that, by adding a due process right, the agency or legislature meant for courts to engage in the difficult task of quantifying an employee's right to challenge an action that, by law, is entirely discretionary. McClain has pointed to no other instances in which courts have had to value a similar right. Therefore, we are unable to read Ohio law to provide an implied cause of action for monetary relief for violations of Regulation P.

Although we have not uncovered anything in Ohio law to indicate that every right must have a remedy,[1] we recognize that Ohio courts may more readily infer a private cause of action if refusal to do so would leave the right wholly unenforceable. For instance, in *Upperman v. Grange Indemnity Insurance*, No. 04CVG-12-13009, 2005 WL 3309596, at *3 (Ohio Ct. C.P. Mar. 24, 2005), an Ohio trial court held that there was an implied private right of action when plaintiffs were

---

[1]Contrary to McClain's argument, the Ohio constitution does not compel the conclusion that Ohio provides a cause of action for violation of the regulation. McClain argues that we must infer the existence of a private cause of action or else she will be left without a remedy in violation of Article 1, Section 16 of the Ohio constitution, which, in relevant part, states as follows: "[E]very person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law . . . ." McClain, however, refers to no case for the proposition that, under this language, every regulatory procedural protection must be enforceable in court.

members of the intended class of beneficiaries and no other effective civil enforcement mechanism existed. Ohio courts have generally refused to infer the existence of a private right of action only when an administrative enforcement scheme was already in place. *See, e.g.*, *Strack*, 515 N.E.2d at 1007-08; *Doe v. Adkins*, 674 N.E.2d 731, 736 (Ohio Ct. App. 1996). In this case, although the record reveals no administrative enforcement scheme or other existing remedy for rights created in Regulation P, we assume, without deciding, that in proper circumstances the denial of Regulation P due process would warrant injunctive relief. *Cf. Eggers v. Morr*, 124 N.E.2d 115, 119 (Ohio 1955) (denying injunctive relief because adequate remedy at law existed). McClain has not sought injunctive relief either for reinstatement or for a hearing. If the existence of a right to due process under Regulation P requires some court enforcement, we assume that the availability of injunctive relief would suffice. The third factor thus does not compel us to find a private cause of action for monetary relief, as sought by McClain.

## IV.

Although McClain has a right to due process under Regulation P, McClain does not have a property interest that is protected by the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. Property interests are not created by the Federal Constitution, but they are instead created by existing rules or understandings from an independent source such as state law. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). State law creates property interests by manifesting "rules or mutually explicit understandings that support [the plaintiff's] claim of entitlement to the benefit and that [the plaintiff] might invoke at a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). No constitutional entitlement to procedural due process can logically arise when the decision-maker's power is wholly discretionary. For instance in *Bishop v. Wood*, 426 U.S. 341, 345-47 (1976), the Supreme Court held that a city police officer, who held his position at the will and pleasure of the city, had no property interest in his job even though he was entitled to certain procedural rights provided by the city.

McClain is an unclassified employee, who does not have a protected property interest in her continued employment. Regulation P states that all employees of a community-based correctional facility are "unclassified." "Unclassified" employees, unlike "classified" employees, "serve at the pleasure of their appointing authority, and may be dismissed from their employment with or without cause." *Campbell v. Washington County Pub. Library Bd. of Trs.*, No. 04-CA44, 2005 WL 1405789, at *2 (Ohio Ct. App. June 10, 2005); *see also Christophel v. Kukulinsky*, 61 F.3d 479, 482 (6th Cir. 1995) (stating that "[u]nclassified civil servants [under Ohio law] have no property right to continued employment"). Because McClain may be dismissed without cause, she cannot "invoke at a hearing," a mutually explicit understanding that she was entitled to retain her employment.[2] *Perry*, 408 U.S. at 601. It follows that McClain lacks a property interest for federal procedural due process purposes, notwithstanding the fact that state law provides her some procedural protection.

McClain argues that this circuit's case law supports holding that an employee who is entitled to some form of process under state law has a federally protected property interest. The two cases to which McClain refers do not demonstrate that a right to due process grounded in state law is sufficient to create a property interest protected by the Federal Constitution. They reveal instead

---

[2]McClain argues, for the first time on appeal, that NorthWest granted McClain a mutually explicit understanding that she would be fired only for cause because Wichtman told her orally, and later confirmed in writing, that "if you do your job, you'll have your job." *See* McClain's Br. at 16. This argument is waived because McClain did not raise this argument in the district court. *See United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 758 (6th Cir. 1999). Nowhere in any of McClain's three briefs regarding the issues of attorneys fees and McClain's employment status did McClain raise this separate argument. Instead, McClain relied solely on the language in Regulation P in arguing that state law had created a federally protected property interest.

that process rights are sufficient to create property interests only when the decisions made as a result of that process are governed by discernible standards.

*Mertik v. Blalock*, 983 F.2d 1353 (6th Cir. 1993), does not support McClain's argument. In *Mertik*, we held that a skating instructor had a property interest protected by the Fourteenth Amendment in being able to use a municipality-owned skating rink. There was an implied contract between the instructor and the skating rink that she would be permitted to use the rink with her students (with whom she had entered contracts that could be performed only if she had access to the rink) as long as she complied with the obligations that the rink imposed. *See id.* at 1361. The instructor thus had a property interest derived from contract law that could be taken away only if the instructor failed to meet her obligations. Although we did not describe the obligations, we obviously found them ascertainable or else it would have been impossible to determine in the future if the skating instructor breached her implied contract. These obligations were analogous to having a "for cause" requirement. In McClain's case, NorthWest may fire her for any reason that it chooses because McClain is an "unclassified employee."**³** *Mertik* does not establish that a state right to process alone creates a federally protected property interest.

*Lucas v. Monroe County* is also of no assistance to McClain. In *Lucas*, we held that a wrecker service had no protected property interest in staying on a stand-by tow list when no established procedures for removal existed. 203 F.3d 964, 978 (6th Cir. 2000). The *Lucas* court distinguished the district court case of *Gregg v. Lawson*, 732 F. Supp. 849, 853 (E.D. Tenn. 1989), a similar case in which the district court held that a wrecking service had a federally protected property interest. We did state that in *Gregg*, unlike in *Lucas*, "several references to and procedures for removal or suspension from the list to compel compliance with the regulations reflect the mutual nature of the relationship established by inclusion on the list." *Lucas*, 203 F.3d at 978 (quoting *Gregg*, 732 F. Supp. at 853). While this language refers to procedures, the ultimate inquiry is the "mutual nature of the relationship." In fact, in *Gregg*, the quoted language in the district court opinion follows a long list of substantive requirements that could determine whether a wrecker could be removed from the tow list, such as failing to respond to a call and charging excessive rates. These cases simply do not stand for the proposition that promises of some kind of procedure create federally protected property interests. McClain, unlike the wrecker in *Gregg*, identifies no established standards for terminating employment and thus fails to demonstrate that she has a federally protected property interest.

Therefore, for the foregoing reasons, the district court properly held that McClain does not have a property interest warranting federal procedural due process protection.

## V.

McClain's claims of discrimination, however, are able to survive summary judgment because McClain presented sufficient evidence from which a reasonable jury could find that NorthWest's stated justifications were pretextual and that its stated qualifications were not legitimate.

For claims such as McClain's that lack direct evidence of intent to discriminate, the well-established *McDonnell Douglas/Burdine* burden-shifting framework applies to claims of

---

**³**McClain cites the following dicta in the opinion to support her belief that a right to process creates a federally protected property interest: "Rather, the characterization of [a doctor's] staff privileges [at a hospital] as property is dependent upon whether the hospital granting the privileges has undertaken not to terminate the physician's privileges without cause and/*or* some form of process." *Mertik*, 983 F.2d at 1360 (emphasis added). This dicta merely summarized cases concerning physicians' hospital privileges, which the skating instructor argued were analogous to her privileges at the rink, and arose only in the context of our demonstration that a plaintiff cannot merely announce that certain privileges are protected interests. *See id.* We did not hold that process alone created a federally protected right.

discrimination brought under Title VII, § 1981, and Ohio law. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). To established a prima facie case of gender or racial discrimination under *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), McClain must demonstrate that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was treated differently than similarly-situated male and/or nonminority employees for the same or similar conduct. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999). If McClain sustains her burden of establishing a prima facie case, the burden then shifts to NorthWest to articulate a legitimate, nondiscriminatory reason for, in this case, McClain's unequal pay and termination. If NorthWest successfully carries its burden, the burden returns to McClain to produce evidence from which a jury could find that NorthWest's stated reason is merely pretextual. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). McClain may demonstrate pretext by showing that NorthWest's articulated reasons "(1) had no basis in fact, (2) . . . did not actually motivate [the adverse action taken against her], or (3) . . . were insufficient to motivate [the adverse action taken against her]." *E.g.*, *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (italics omitted).

### 1.        *Disparate Treatment—Pay*

McClain has presented sufficient evidence to create a genuine issue of material fact as to whether NorthWest was motivated by McClain's gender and/or race when NorthWest paid her less than a Caucasian male. It is undisputed on this claim that McClain has established a prima facie case because she is a black female who was qualified at the time of her hire as an RSC and was paid less than a Caucasian male RSC. In response, NorthWest produced two legitimate, nondiscriminatory reasons for paying McClain less: McGee had additional computer work, and McGee had previous experience working in community-based correctional facilities. McClain has presented sufficient evidence for a reasonable jury to find that both of NorthWest's stated reasons are pretextual.

McClain has produced sufficient evidence for a jury to find that NorthWest's first proffered legitimate reason—that McGee had additional computer responsibilities—was merely pretextual. First, McClain's affidavit supports a finding that McGee had no additional computer duties. From her statement that NorthWest never asked her whether she was interested in assuming computer duties, it can be reasonably inferred that her work did not include any computer duties, and she also declared that she and McGee "were doing the same work." JA 241. Second, neither the letter offering employment to McGee nor the published job description for RSCs mentions any potential computer duties. Third, unlike the manner in which NorthWest allegedly clumped McGee's base and additional pay together, when NorthWest offered employment to Lawrence McCarthy, NorthWest separated his base salary from money that he received for completing computer duties. Finally, NorthWest did not mention McGee's alleged computer duties until this litigation began. Instead, the only justification that McClain received was that McGee had prior experience in community-based corrections. This evidence is sufficient to create a genuine issue of material fact as to whether NorthWest paid McGee more because of his computer duties.

The district court assumed that McClain's evidence was not sufficient because McClain failed to declare that McGee did not have computer duties. Because McClain states in her affidavit that she had no computer duties and that she and McGee did the same work, a jury could conclude that McGee had no computer duties. The other evidence mentioned above also suggests that McGee was not paid more because he had computer duties. Moreover, McClain does not have to prove that NorthWest's proffered reason is false; instead, she may demonstrate that the proffered reason "did not actually motivate" the adverse action, *Manzer*, 29 F.3d at 1084. Even if McGee had additional computer duties, NorthWest's reliance on McGee's experience, instead of his computer duties, until

this litigation began creates a genuine issue of material fact as to whether McGee received his higher salary because of his computer duties.

McClain has also demonstrated the existence of a genuine issue of material fact as to whether NorthWest's second proffered reason—that McGee received more money because of his previous work in community-based corrections—is pretextual. McClain has demonstrated that, even if McGee had prior experience, a reasonable juror could find McGee's prior experience was not the actual reason for his increased salary. *See Manzer*, 29 F.3d at 1084. McClain points to evidence that Gunter-Fearheiley originally said that both McClain and McGee made the same amount of money, that Gunter-Fearheiley became angry when McClain told Gunter-Fearheiley that she had learned of the salary differential, and that Gunter-Fearheiley refused to show McClain documents demonstrating a preference for employees with experience in community-based corrections. Construing the evidence in a light most favorable to McClain, Gunter-Fearheiley's lie, anger, and refusal to show McClain any documents could provide a basis for a jury to infer that Gunter-Fearheiley was hiding or embarrassed about the true, unlawful reason for the pay differential.

McClain's later pay increase, which came with and continued after her short-lived promotion, does not preclude the jury from finding that NorthWest paid McClain less because of her status as a black female. NorthWest argues that McClain was paid more than two Caucasian males, both of whom lacked experience in community-based corrections, when she returned to being an RSC and retained her $2000 pay increase. But the fact that McClain was paid more than two Caucasian men after she complained fails to address why McClain was paid less when she was first hired. The two other male employees were not working for NorthWest at the time that McClain complained, and thus their pay does not demonstrate that McClain was making the same amount of or more money than Caucasian men at the time she was hired. NorthWest's odd decision to promote an employee it deemed unqualified only about a month later may mitigate its damages, but a later pay increase does not establish that NorthWest was not discriminating at the time of McClain's hire. Ultimately, a reasonable jury could infer that Gunter-Fearheiley and NorthWest's alleged justifications were pretextual.

### 2.    *Disparate Treatment—Termination*

McClain's claim that her employment was terminated because of her race or gender is also able to survive summary judgment. A jury could infer from the evidence that NorthWest's expectations for her employment—that she be a good communicator and able to implement the philosophy of the institution—were not legitimate. To be qualified, McClain "must show that she was performing at a level which met [NorthWest's] legitimate expectations" at the time of her discharge. *See Jacklyn*, 176 F.3d at 929. McClain concedes in her deposition that she is not a good communicator. McClain has, however, challenged whether NorthWest's stated expectations were legitimate. In *Seay v. Tennessee Valley Authority*, this court cited language from 1 Lex K. Larson, Employment Discrimination § 8.02[3], at 8-29 (2d ed. 2003): "A court may be inclined not to take the employer's stated qualifications seriously when in fact the employer does not consistently adhere to those stated qualifications when making employment decisions." 339 F.3d 454, 466 (6th Cir. 2003); *see also Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979) ("plaintiff may proceed with indirect evidence, as by demonstrating that the reason advanced applied to other employees who did not have plaintiff's 'protected' characteristics, but that they were not rejected or fired"). McClain has produced evidence from which a reasonable jury could find that NorthWest has not consistently adhered to its stated expectations.

Although NorthWest argues that McClain was not qualified because she (1) lacked communication skills and (2) was unable to implement the philosophy of the facility, McClain proffers evidence that demonstrates a Caucasian male RSC, Bruce Mort, had similar problems and was not fired. For instance, he displayed communication problems and discomfort with the

philosophy of the community-based approach: he had inappropriate relationships with the residents, he defied orders, he undermined Resident Specialists who reported to him, and he was encouraged to give more in-put at meetings. NorthWest even told him that his failure to empower his staff caused him to "undermine[] the Therapeutic Community." JA 421. But besides these infractions, Mort's misconduct was arguably more severe than McClain's misconduct. He purchased a car from the father of a resident, made sexual comments, and engaged in behavior with sexual connotations. He also falsely signed "Bruce A. Mort, Supervisor" to an unauthorized letter sent to a judge on behalf of one of the residents, requesting that the charges against the resident be dismissed. After sending the unauthorized letter in May of 2000 and being confronted by NorthWest directors, Mort, like McClain, refused to sign forms that Gunter-Fearheiley had requested that he sign, and he refused to take responsibility for his behavior. Mort, unlike McClain, was not terminated for failure to meet legitimate expectations. With this evidence, a jury could reasonably find that NorthWest's expectations for McClain's job performance were not legitimate because NorthWest did not fire another RSC who had problems communicating and implementing the center's philosophy. Therefore, summary judgment was not warranted in favor of NorthWest with respect to either of McClain's discrimination claims.

## VI.

Finally, McClain has presented sufficient evidence for a jury to find that NorthWest fired McClain because she complained about her disparate pay. For unlawful retaliation, McClain "must demonstrate by a preponderance of the evidence that: "1) [s]he engaged in activity that Title VII protects; 2) defendant knew that [s]he engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003). NorthWest apparently concedes the first three criteria are met because NorthWest argues only that plaintiff was not fired because of her complaint.[4] *See* NorthWest's Br. at 15.

Although McClain's evidence of a causal connection is not very strong, she has satisfied her burden of demonstrating a causal connection between her protected activity and her terminated employment. "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *See Abbott*, 348 F.3d at 542 (italics omitted). NorthWest's own director, James Wichtman, testified in his deposition that McClain raised the issue of disparate pay with Gunter-Fearheiley at a staff meeting. Gunter-Fearheiley was upset about how McClain learned of McGee's salary and raised her voice. Wichtman said that raising one's voice was common at these staff meetings, but he could not recall if McClain raised her voice.

William Jones, McClain's co-worker, declared that, although Gunter-Fearheiley and McClain were "tight" before the meeting, "From the September meeting forward, it appeared to me from the way I saw Gunter treat McClain, that Gunter was out to get McClain." JA 264. Jones also declared that Gunter-Fearheiley and Wichtman dominated the meeting in which McClain's performance at NorthWest was discussed. From this evidence, a jury could reasonably infer from Gunter-Fearheiley's changed disposition that McClain's opposition to unequal pay ultimately caused Gunter-Fearheiley to have McClain's employment terminated.

NorthWest counters with what it considers two legitimate reasons: (1) there was no disparate pay, and (2) NorthWest justifiably fired her for not interacting well with the other staff and not implementing the facility's philosophy. The first reason is legally insufficient because McClain can

---

[4]Because NorthWest has not challenged McClain's assertion that she engaged in "protected activity" when she confronted Gunter-Fearheiley, we assume without deciding that McClain's behavior was sufficient to qualify as "protected activity." *See EEOC v. Ohio Edison Co.*, 7 F.3d 541, 545-46 (6th Cir. 1993).

establish a claim for retaliation even if no unlawful employment practice occurred. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000). The second reason is a nondiscriminatory reason for terminating McClain's employment. But McClain, as with her discrimination claim based on gender and race, has created a genuine issue of material fact as to whether NorthWest's nondiscriminatory reason was legitimate.

As previously mentioned, McClain does not contest that her communication skills were lacking; thus, she admits that a nondiscriminatory reason existed for the termination of her employment. Nevertheless, with the evidence that NorthWest did not fire Mort with similar infractions, McClain presents evidence from which a reasonable jury could find that her inability to communicate effectively and to implement the center's philosophy were not legitimate reasons for her dismissal. Because a jury could infer from the evidence that McClain presents that NorthWest had no legitimate, nondiscriminatory reason for firing her and thus that NorthWest fired her for retaliatory purposes, summary judgment was not proper for McClain's retaliation claims.

## VII.

For the foregoing reasons, we AFFIRM the order of the district court insofar as it granted summary judgment on McClain's due process claims. We REVERSE the order of the district court insofar as it granted summary judgment on McClain's discrimination and retaliation claims.