NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0384n.06
Filed: June 27, 2008

No. 07-4136

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DOREEN FUELLING, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| NEW VISION MEDICAL | ) | |
| LABORATORIES LLC and ST. RITA'S | ) | |
| MEDICAL CENTER, | ) | OPINION |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

Before: GILMAN and COOK, Circuit Judges; and COHN, District Judge.[*]

**RONALD LEE GILMAN, Circuit Judge.** Doreen Fuelling, a white female, was employed as a phlebotomist by New Vision Medical Laboratories LLC in March of 2004 and assigned to work in the laboratory at St. Rita's Medical Center. She alleges that black employees regularly used racially derogatory language when referring to white employees and to each other. Moreover, she claims that Ruth Ward, a black female who supervised the phlebotomists, tolerated such language when used by black employees, but disciplined white employees, including Fuelling, for using the same language, and generally treated black employees more favorably than she treated white employees.

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

Fuelling filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) in March of 2005, claiming reverse race-based discrimination, a hostile work environment, and retaliation in violation of both Title VII of the Civil Rights Act of 1964 and Ohio state law. She then filed a complaint in the federal district court in January of 2006, asserting the same claims that she had presented to the EEOC, as well as a claim for the intentional infliction of emotional distress under the common law of Ohio. Finally, in June of 2006, Fuelling was discharged by New Vision because, according to the company, she had filed false reports against three coworkers, used racial slurs, and had conflicts with coworkers, patients, and clients of St. Rita's.

This timely appeal followed the district court's grant of summary judgment for New Vision and St. Rita's on all claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

New Vision provides staff for the laboratories of six medical centers. It is jointly owned by Van Wert County Hospital and St. Rita's. St. Rita's is also a customer of New Vision, paying New Vision to manage and staff its medical laboratory. Fuelling alleges that, during her tenure there, she was subjected to reverse racial discrimination, a hostile work environment, and retaliation in violation of various federal and state laws.

In support of her claims, Fuelling makes several general allegations regarding racial language used by black employees and discriminatory treatment by Ruth Ward, a black female who supervised Fuelling and the other phlebotomists. Fuelling's affidavit alleges that black employees "regularly

2

used racial language," including "nigger" when referring to other black employees, and referred to white employees as "white bitches," "crackers," and "vanilla wafers." She alleges that she herself was referred to as "the white bitch" by black employees "on numerous occasions," although she identified the speaker on only one occasion.

Such language, Fuelling contends, was often used in the presence of Ward. Fuelling claims that Ward did not reprimand black employees who used these offensive words, instead allowing the practice to continue "without comment." In contrast, Ward allegedly reprimanded white employees for using similar language. Fuelling also submitted affidavits from two white coworkers, Betty Brown and Brenda Zachary, containing allegations of Ward treating black employees better than white employees. Zachary, for example, claimed that Ward "regularly allowed black employees much more leeway in coming into work late[] than white employees are allowed," although she did not cite any specific examples of such behavior.

In addition to the general allegations set forth above, Fuelling recounted several examples of purportedly discriminatory treatment in support of her claims. One such allegation is that she was called a "white bitch" by Kim Napier, a black coworker, on "at least one occasion." She contends that Napier was not disciplined for that comment.

In June of 2006, Fuelling filed a report claiming that an employee had called another employee a "stupid f---ing Mexican wetback spic." Susan Hymer, New Vision's Executive Director, said that Fuelling's complaint was investigated by Ward and two other members of management but, according to interviews with the employees that Fuelling had listed as witnesses, "[a]ll five of them either did not hear [the comment] or did not hear anything but 'spic.'" Hymer (who is white) determined that Fuelling had made the complaint in bad faith, and further found that such complaints

3

were "a pattern" with Fuelling. The record does not indicate whether anyone was disciplined regarding the incident.

On another occasion, Fuelling claimed that a black patient became hostile and called Fuelling a "white bitch" several times. Fuelling later referred to the patient as a "stupid nigger," a comment that was reported to Ward. Ward then filed a disciplinary report against Fuelling for "making racial slurs within the laboratory." Brown's affidavit asserts that Ward once approached Brown and encouraged her to report Fuelling for having used the term "darkie" in a conversation. A supervisor other than Ward filed a report against Fuelling for using the same term.

Zachary's affidavit describes an incident in which Ward "yelled" at a white employee for commenting that she had had "the shits" while suffering from influenza, but did not say anything a few minutes later when a black employee said the "F" word loud enough for Ward to hear. The record does not identify either of the employees involved in these verbal incidents.

Finally, Brown alleged that on two occasions Ward favored black individuals to fill available phlebotomist positions. Brown stated that a black woman was chosen for a phlebotomist position even though the woman purportedly had "no special qualifications for the job" as compared to any other phlebotomist. On the other occasion, Brown alleged, a job in the outpatient department became available and Ward asked if anyone wanted to take a class that "would lead to the job." Brown stated that several phlebotomists, including Brown, "indicated that [they] wanted to take the class," but that only one person, a black employee, "was allowed to take the class." Hymer's affidavit explained that employees had to make their own arrangements to take the two required courses in the class, and that the black employee was the only one who actually signed up for them, an assertion that Fuelling does not dispute.

4

The defendants, in response to Fuelling's allegations, recount numerous disciplinary problems with Fuelling during her employment with New Vision in the St. Rita's laboratory, and contend that these problems were the reason for her eventual termination. They specifically cite the following: (1) Fuelling had ongoing conflicts with other employees, (2) a number of Fuelling's coworkers filed multiple complaints against her because she purportedly used racial slurs and acted in an unprofessional manner towards coworkers and patients, (3) New Vision determined that Fuelling submitted several false reports against her coworkers, and (4) New Vision received two complaints from local law enforcement officers who reported Fuelling for being rude and uncooperative when the officers requested that she draw blood for blood-alcohol samples. The details of these allegations are described below, in chronological order.

Two months after Fuelling began working at St. Rita's, she became embroiled in a personal conflict with coworker Joan Castillo. A supervisor met with the two women in July of 2004 in an unsuccessful attempt to resolve the conflict. Fuelling later accused Castillo of spreading a false rumor about Fuelling, and Castillo accused Fuelling of calling her names. In November of 2004, Ward filed a disciplinary action against Fuelling, stating that the "situation ha[d] become very hostile and [was] affecting other 3rd shift staff." Fuelling agreed with this description in her deposition. Ward could not recall if she investigated the women's claims, but said that she spoke with and disciplined both of them.

Will Cason, St. Rita's vice-president of human resources, also attempted to resolve the Fuelling-Castillo conflict because their feud "was disruptive to the mission of the organization." He recommended to Hymer that both women be suspended. According to Cason, final employment decisions are made by New Vision, although St. Rita's provides consultation and recommendations

5

in such matters. Hymer explained in the disciplinary report filed against Fuelling that New Vision felt that "the performance and the operation of the department were being jeopardized" by the dispute. Both women were placed on administrative suspension, but lost no work days.

In the fall of 2004, Fuelling complained that Ward had announced patients' full names, locations, and medical tests over the hospital radio on three separate occasions, in violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA). According to Hymer, New Vision investigated the allegations, but found no evidence that Ward had broadcast the patients' names or violated HIPAA. Fuelling contends that Ward thereafter retaliated against her for having made the allegations.

Between the fall of 2004 and the spring of 2005, multiple coworkers reported Fuelling for using racial slurs on at least three occasions. Fuelling admitted that she used the words, but argued that her comments were taken out of context. According to the disciplinary reports documenting these incidents, Fuelling was told that termination would result if such conduct continued.

In March of 2005, Fuelling filed a charge of discrimination with the EEOC that recounted her allegations of race-based discrimination and retaliation. She subsequently received right-to-sue letters from the EEOC. Fuelling filed the present complaint in federal district court in January of 2006, while she was still working at New Vision.

In March of 2006, Hymer completed another disciplinary report concerning Fuelling, this time based on reports that Fuelling had engaged in "multiple incidents" of rude and confrontational behavior towards coworkers, the staff of St. Rita's pharmacy, and local law enforcement officers. That report documented, in particular, two complaints submitted by the County Sheriff's Department and the Lima City Police Department, claiming that Fuelling had been "confrontational,

6

uncooperative, and difficult" when officers asked her for assistance in drawing blood samples for blood-alcohol testing. Hymer's report stated that "[i]f Doreen chooses not to modify her behavior, future incidents will result in progressive disciplinary action." Fuelling denied her coworkers' allegations and challenged the officers' versions of events, explaining that she had refused their demands for blood-alcohol samples because, on each occasion, the officers had insisted that she conduct the blood draws in violation of the hospital's standard protocol.

Following the March 2006 disciplinary action, Fuelling asked a number of St. Rita's employees to sign a "survey" expressing their support for her. Hymer received complaints about Fuelling's survey from various employees. As a result, Hymer completed a disciplinary report against Fuelling for "pursuing personal activity on work time and interfering with the work of others," in violation of New Vision policy.

From April to June of 2006, Fuelling filed multiple complaints against various coworkers (none of which alleged the use of racial slurs), including a complaint against "the entire second shift." But she herself was the subject of two coworker complaints during the same time period. One of Fuelling's complaints accused another phlebotomisat at St. Rita's of sticking patient Mary Barbier five times in an attempt to draw blood. Barbier had recounted to Fuelling a prior incident in which a phlebotomist had stuck Barbier five times when drawing blood. Fuelling thought that she knew the identity of the phlebotomist and submitted a complaint against that person. Ward investigated the report and spoke with Barbier, but found that the incident had occurred at another medical center and did not involve either New Vision or St. Rita's. Fuelling later conceded that her accusations were false.

Hymer decided to terminate Fuelling's employment in June of 2006 because, in the four months leading up to Fuelling's termination, "New Vision had received complaints about Fuelling's behavior from at least seven co-workers, two police departments, a nurse, and the Pharmacy Department at St. Rita's." Fuelling's termination, New Vision asserts, was primarily based on the false reports that Fuelling had filed against her coworkers, but was also based on Fuelling's undisputed history of conflicts with coworkers and others, as well as Fuelling's resistance to counseling on those issues. New Vision replaced Fuelling with another white female.

## B.    Procedural background

Fuelling brought suit against New Vision and St. Rita's in January of 2006, and filed an amended complaint one year later. Her complaint as amended alleges reverse racial discrimination, a hostile work environment, and retaliation in violation of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) and 3(a), and Title VII's state-law counterpart, Ohio Revised Code § 4112.02. It also asserts a claim of intentional infliction of emotional distress, in violation of Ohio common law. The defendants thereafter filed a motion for summary judgment, which the district court granted. This timely appeal followed.

## II.  ANALYSIS

## A.    Standard of review

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable

inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.      Fuelling's reverse race discrimination claim**

Title VII prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. In the absence of direct evidence of discrimination, "the well-established *McDonnell Douglas/Burdine* burden-shifting framework applies to claims of discrimination brought under Title VII . . . and Ohio law." *McClain v. Nw. Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 332 (6th Cir. 2006) (articulating that framework and citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Tex. Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Accordingly, a plaintiff claiming race-based discrimination supported only by circumstantial evidence must demonstrate that "(1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was treated differently than similarly-situated male and/or nonminority employees for the same or similar conduct." *Id.* A plaintiff alleging discriminatory termination of employment must show under the fourth *McDonnell Douglas* prong that he or she was replaced by a person outside of the protected class. *Logan v. Denny's, Inc.*, 259 F.3d 558, 567 (6th Cir. 2001).

The original *McDonnell Douglas* standard required the plaintiff to show that "he belongs to a racial minority" because "[m]embership in a socially disfavored group was the assumption on

which the entire *McDonnell Douglas* analysis was predicated." *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1016-17 (D.C. Cir. 1981) (modifying the *McDonnell Douglas* framework in a race discrimination case brought by a white plaintiff). But "Title VII, of course, prohibits racial discrimination against all groups." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279 (1976)). Thus "[w]hites are also a protected group under Title VII." *Parker*, 652 F.2d at 1017.

Accordingly, this court has modified the first prong of the *McDonnell Douglas* standard to address claims of race-based discrimination brought by white plaintiffs. *See Murray*, 770 F.2d at 67 ("'Reverse discrimination' claims require application of a *McDonnell Douglas* standard modified to reflect this context as well as the factual situation of the claim."). The first prong in establishing a prima facie case in such "reverse discrimination" cases does not require the plaintiff to show that he or she is a member of a racial minority. Instead, it requires the plaintiff to establish "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255-57 (6th Cir. 2002) (alteration in original; internal quotation marks omitted) (explaining that a plaintiff may show that such background circumstances exist by presenting evidence that a defendant's "unlawful consideration of race as a factor in hiring in the past justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely," and concluding that the plaintiff had made such a showing where the person responsible for the company's hiring was black (internal quotation marks omitted)); *see also Parker*, 652 F.2d at 1018 (explaining that "evidence of a racially discriminatory environment serve[s] as a functional equivalent of the first *McDonnell Douglas* criterion, membership in a racial minority").

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *See McClain*, 440 F.3d at 332. "If [the defendant] successfully carries its burden, the burden returns to [the plaintiff] to produce evidence from which a jury could find that [the defendant's] stated reason is merely pretextual." *Id.* (citing *Burdine*, 450 U.S. at 253). The plaintiff may establish pretext by showing that the defendant's alleged nondiscriminatory reason "(1) had no basis in fact, (2) did not actually motivate defendant's conduct, or (3) was insufficient to warrant the challenged conduct." *Zambetti*, 314 F.3d at 258.

Although the defendants in the case before us concede that Fuelling experienced adverse employment actions (prong two) and was a qualified phlebotomist (prong three), they argue that she did not satisfy either the first or fourth prongs of the prima facie test. The defendants also argue that, even if Fuelling is found to have established a prima facie case, she failed to establish that New Vision's legitimate reasons for firing her were only a pretext designed to hide discrimination.

We need not decide whether Fuelling established the requisite "background circumstances" under the first prong of the prima facie analysis because we conclude that (1) her prima facie case fails under the fourth prong, and (2) even assuming that she had established a prima facie case, she has failed to show pretext. Each of these conclusions is discussed in turn.

### 1.     *The fourth prong*

Fuelling claims that the disciplinary actions taken against her and her eventual termination were discriminatory. The latter claim clearly fails because she was replaced by a white female. *See Logan*, 259 F.3d at 567. Her claim of discriminatory discipline also lacks merit because she failed

to assert any factual allegations whatsoever showing that she was similarly situated to the black employees who were purportedly *not* disciplined for the same conduct that Fuelling engaged in.

This court has explained the showing that is required under the fourth prong of the prima facie test as follows:

> In order for two or more employees to be considered similarly-situated for purposes of creating an inference of disparate treatment in a reverse discrimination case, the plaintiff must prove that all of the relevant aspects of his employment situation are nearly identical to those of the [] employee who he alleges was treated more favorably.

*Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004) (brackets and internal quotation marks omitted). "The similarities between the plaintiff and the [other] employee must exist in all relevant aspects of their respective employment circumstances. Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." *Id*. (citation and internal quotation marks omitted).

Fuelling has identified only one black employee, Kim Napier, who allegedly called Fuelling a derogatory name and was not disciplined. But even then, Fuelling provided no information about Napier—such as her position, job responsibilities, years of experience, length of tenure at New Vision, or disciplinary history—that would indicate whether Napier and Fuelling were similarly situated in all relevant aspects of their employment. *See id*.

Apart from the Napier incident, Fuelling fails to identify any other black employee who was not disciplined for similar behavior. Fuelling states that she was disciplined by Ward for calling a patient a "stupid nigger," and that Ward did not discipline black employees for using the same language. But Fuelling does not identify any of those black employees, cite any specific instances

12

in which black employees other than Napier used such language, or assert any facts indicating that black employees who were not disciplined were "similarly situated" to her.

Zachary alleges in her affidavit that Ward yelled at a white employee for using the term "the shits," but did not reprimand a black employee who, a few minutes later, used the "F" word. Neither employee is ever identified. The same is true of her allegations about an employee who called someone a "spic." Even assuming that the speakers were not disciplined for making these comments, Fuelling fails to demonstrate how they were similarly situated to her.

Turning to Brown's affidavit, she alleged that Ward chose a black woman to fill a phlebotomist position even though the woman had "no special qualifications" compared to any other phlebotomist, and that only a black employee "was allowed" to take a class required for a job in outpatient services. With regard to the former allegation, Brown provides no evidence to substantiate her conclusory assertion about the black woman's qualifications. The latter allegation is also unsupported by specific factual allegations. Brown does not identify the "several phlebotomists" who were allegedly denied access to the class or claim that they were nonblack individuals. But even assuming that they were all white, Brown fails to allege any facts indicating that the black woman who was "allowed" to take the class was similarly situated to those unidentified persons who were allegedly not allowed to take the class.

The party opposing a motion for summary judgment "must present some 'specific facts showing that there is a genuine issue [of fact] for trial,'" *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)), and affidavits submitted in support thereof "must be made on personal knowledge," Fed. R. Civ. P. 56(e)(1). Under this standard, Fuelling has failed to create a genuine issue of material fact with respect to whether she

13

was similarly situated to the black employees who were allegedly treated better than she was treated. *See, e.g.*, *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (explaining that a plaintiff is "required to prove that all of the relevant aspects of his employment situation were nearly identical" to those of the employee who was allegedly treated more favorably in order to satisfy the fourth prong of the prima facie test (emphasis and internal quotation marks omitted)). That failure is fatal to her prima facie case.

### 2. Pretext

Moreover, even if we were to assume that Fuelling had established a prima facie case of discrimination, her claim ultimately fails for another reason. The record contains ample evidence supporting the district court's conclusion that Fuelling failed to show that the defendants' legitimate and nondiscriminatory reason for disciplining and later firing her was only a pretext designed to hide discrimination.

According to the defendants, the primary reason that they disciplined and eventually terminated Fuelling was her filing of three false reports against other employees—one against Ward for purportedly broadcasting patients' names over the hospital radio, a second against a fellow phlebotomist for supposedly sticking St. Rita's patient Barbier five times in an attempt to draw blood, and a third against a coworker who had allegedly called another employee a "stupid f---ing Mexican wetback spic." The defendants contend that these reports were investigated and proven to be false, thus providing legitimate grounds for disciplining and terminating Fuelling.

Fuelling argues in response that the real reason for New Vision's actions was Ward's discriminatory animus. Specifically, she asserts that the investigations into Fuelling's complaints were biased by Ward's race-based prejudice. But Fuelling does not dispute that Hymer, not Ward,

14

made the decision to terminate her, and she does not allege that Hymer herself harbored any discriminatory animus toward Fuelling. She further concedes that Ward did not recommend that Fuelling be terminated and that Ward's role in Fuelling's termination was limited to printing out Fuelling's disciplinary actions "so that [management] would have all the documents they needed."

The heart of Fuelling's pretext argument is that Hymer "relied on what Ward told her and the information Ward provided her as part of the decision-making process." Hymer's reliance on the purportedly biased reports, Fuelling contends, tainted Hymer's decision to terminate Fuelling. Fuelling's argument, however, is without merit because she has failed to show either (1) that the investigations were biased, or (2) that Ward's alleged bias can be imputed to Hymer.

The district court explained that

> the "determinative question" in a situation where another employee, such as Ward, is alleged to have influenced the corporate decision-maker is "whether [the plaintiff] has submitted evidence that [a particular employee's] racial animus was a cause for termination." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 723 (6th Cir. 2004) (citations omitted). Fuelling has not shown any evidence that any racial animus held by Ward affected the investigations of the Barbier investigation or the alleged anti-hispanic comment, or that the findings of those investigations, as presented to Hymer, were biased. The assertion that Ruth [Ward] "falsely reported the outcome of [Ward's] interview with Ms. Barbier" is conjectural and has no basis in the record cited by Fuelling.

(first and second alteration in original); *see also Noble*, 391 F.3d at 724 ("Unless the statements or conduct of nondecisionmakers can be imputed to the ultimate decisionmaker, such statements or conduct [can not] suffice to satisfy the plaintiff's burden . . . of demonstrating animus." (alteration in original; internal quotation marks omitted)).

To start with, Fuelling has failed to show that the investigations were biased. Her contention that Ward's investigation into the Barbier incident was biased is disingenuous when Fuelling herself

15

admits that her accusations against the St. Rita's phlebotomist were false. She thus concedes the very conclusion that Hymer reached based on Ward's purportedly biased investigation.

Regarding Fuelling's HIPAA-related report against Ward, Hymer had the complaint investigated by having Ward's radio broadcasts monitored for the next three days, but did not find any evidence of the type of conduct that Fuelling had alleged. Although Fuelling asserts that this investigation was also biased, the claim rings hollow because Ward obviously did not investigate the matter; rather, she was the *subject* of the investigation. Fuelling provides no explanation as to how Ward's bias might have influenced the investigation when Ward was its target.

Finally, Ward and two other managers investigated Fuelling's complaint that a coworker had called another employee a "stupid f---ing Mexican wetback spic." The five witnesses identified by Fuelling either denied that anyone had made that comment or heard only the word "spic." As a result, Hymer concluded that Fuelling's report of the incident was based on false information. Fuelling claims that this investigation was biased because of Ward's discriminatory animus, but she fails to explain how Ward's bias might have affected the other two managers, neither of whom are themselves alleged to be racially biased.

Based on the foregoing, Fuelling has failed to show that the investigations into her complaints were biased because of Ward's allegedly discriminatory animus, or that they served as a pretext for New Vision's disciplinary actions against her. Even assuming, however, that Fuelling sufficiently alleged facts from which a reasonable jury could infer that the investigations were biased, Fuelling could prevail with respect to her discriminatory-discipline claim only by further showing that Hymer was a "conduit" of Ward's purported bias. *See Noble*, 391 F.3d at 737. This she has failed to do.

16

In *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862 (6th Cir. 2001), this court found that a coworker's racial animus against the plaintiff could be imputed to the supervisor who fired the plaintiff because the coworker's negative report of an incident involving the plaintiff "was the exclusive and decisive factor" in the termination decision. *Id.* at 878 (explaining that the supervisor did not conduct his own investigation, but terminated the plaintiff based exclusively on the coworker's allegations). Those facts, the court concluded, distinguished the case from *Wilson v. Stroh Cos.*, 952 F.2d 942, 946 (6th Cir. 1992) (finding no "causal nexus" between the company's decision to terminate the plaintiff and a supervisor's racial animus because the decisionmaker had conducted an independent investigation into the plaintiff's conduct), but were analogous to the facts of *Shager v. Upjohn* Co., 913 F.2d 398, 405 (7th Cir. 1990) (holding that a supervisor's age-based prejudice tainted a committee's decision to fire the plaintiff because the supervisor's portrayal of the plaintiff to the committee in the worst possible light "may well have been decisive" in light of the fact that the committee's deliberations were "brief, perhaps perfunctory" and none of the committee members could remember having considered the issue of the plaintiff's termination). *Christian*, 252 F.3d at 878. The *Shager* court explained that if a decisionmaker fires the plaintiff "for reasons untainted by any prejudice of" the other employee, then "the causal link between that prejudice and [the plaintiff's] discharge is severed" and the plaintiff cannot maintain his or her claim. 913 F.2d at 405.

Here, it is undisputed that the disciplinary reports that Ward provided to Hymer were considered in the decisionmaking process. But the record is replete with evidence showing that Hymer had nondiscriminatory grounds for terminating Fuelling that were independent of Ward's alleged bias. Specifically, multiple disciplinary reports were filed against Fuelling by people other

17

than Ward, including Hymer, documenting various problems with Fuelling's conduct. The complaints included Fuelling's use of racial slurs and abusive language, her conflicts with other employees, complaints from law enforcement officers and St. Rita's pharmacy staff, and Fuelling's efforts to petition her coworkers for support.

Hymer personally handled the complaints about Fuelling from the pharmacy staff, law enforcement officers, and the employees who were upset by Fuelling's petition, and for the last few months before Fuelling's termination personally handled everything involving Fuelling. She also explained that in her seven years as New Vision's Executive Director, "the number of complaints [received] concerning Doreen Fuelling's behavior far exceeded the number of complaints for any other employee," and that "[i]n most of my investigations, [and based on] the things Doreen told me, she saw things very differently than everyone else."

In addition, New Vision's employee manual sets forth grounds for disciplining and terminating an employee. It states that "disciplinary action, ranging from verbal warning to termination, may be taken for violations including but not limited to" a violation of hospital policy, discourteous treatment of patients, visitors, or other employees, interfering with the work of others, and making any false statement concerning any patient, visitor, or employee.

The foregoing supports the district court's conclusion that any bias on the part of Ward cannot be properly imputed to Hymer because Hymer fired Fuelling "for reasons untainted by any prejudice" of Ward, thus severing the causal link between Ward's alleged bias and Fuelling's discharge. *See Shager*, 913 F.2d at 405; *Wilson*, 952 F.2d at 946. Furthermore, Fuelling has failed to cite any evidence suggesting that Hymer did not hold an honest belief in her reasons for terminating Fuelling or that Hymer failed to make a "reasonably informed and considered decision."

18

*See Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 503 (6th Cir. 2007) (affirming the grant of summary judgment for the employer where the decisionmaker had before him complaints from various people about the plaintiff's inadequate job performance and demeaning treatment of others, and where the decisionmaker personally observed that the plaintiff failed to address problems that were his responsibility). Fuelling has therefore failed to meet her burden of raising a genuine issue of material fact as to whether Hymer's stated reasons for terminating her were designed to hide Ward's alleged discriminatory animus. Accordingly, we affirm the district court's grant of summary judgment to the defendants on Fuelling's claim of discrimination based on disparate treatment.

**C.      Hostile work environment claim**

Title VII, 42 U.S.C. § 2000e-2(a)(1), also prohibits discrimination that is "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'"   *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (alteration in original) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). A plaintiff can establish a prima facie case of a race-based hostile work environment by demonstrating the following five elements:

> 1) that he [or she] is a member of a protected class; 2) that he [or she] was subjected to unwelcome racial harassment; 3) that the harassment was based on race; 4) that the harassment had the effect of unreasonably interfering with [the plaintiff's] work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability.

*Newman v. Fed. Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001).

This court "look[s] to the totality of the circumstances" in determining whether a hostile or abusive workplace existed. *Id*. "Isolated incidents . . . , unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Bowman v. Shawnee State*

19

*Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). Appropriate factors to consider "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Fuelling's claim is based on her contention that, "on numerous occasions," she was referred to as "the white bitch" by black employees. On only one occasion, however, was Fuelling able to identify the speaker. Her claim is otherwise based on the general allegation asserted in her affidavit that "[b]lack employees regularly used racial language, including the term 'nigger.' When speaking of a white person critically, Fuelling claimed, black employees would often use the terms 'white bitch,' 'f---ing white bitch,' white trash,'" as well as "'crackers' or 'vanilla wafers.'"

Brown's and Zachary's affidavits contain similarly generalized allegations. But their allegations are not relevant to Fuelling's claim because Brown and Zachary do not allege that Fuelling was aware of the offensive comments mentioned by Brown and Zachary, and because Fuelling herself does not claim that she was aware of those comments. *See Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000) (concluding that evidence regarding harassing behavior toward women, set forth in affidavits submitted by two of the plaintiff's coworkers, was not relevant to the plaintiff's hostile-work-environment claim because there was no evidence that the plaintiff was aware of the conduct at the time). Fuelling's claim must therefore be evaluated based on her own allegations. *See id.*

But Fuelling has produced no evidence showing that the comments were more than merely offensive. She did not allege facts indicating that they were either humiliating or physically threatening, nor did she explain or provide a single example of how the comments made her job

20

more difficult. Most problematic for Fuelling, however, is the fact that she failed to present any evidence to substantiate her conclusory assertions that the remarks occurred "numerous" times, "often," or "regularly" during her two-year tenure with New Vision. Such allegations are unaccompanied by specific instances of racial comments to support her claim that they occurred so frequently as to be severe or pervasive, and give no indication of the time, place, or context of the remarks. *Compare Sweezer v. Mich. Dep't of Corr.*, No. 99-1644, 2000 WL 1175644, at *5-6 (6th Cir. Aug. 11, 2000) (concluding that the plaintiff had failed to create a genuine issue of material fact as to whether demeaning comments about the plaintiff's nationality were severe or pervasive because, although the plaintiff claimed that he was "constantly harassed," he did not specify the time frame in which a number of instances of racially discriminatory conduct occurred, including five particular derogatory comments), *with Abeita v. TransAm. Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998) (holding that a plaintiff's assertions that a coworker's sexual and derogatory gender-based comments were "commonplace," "ongoing," and "continuing" created a genuine issue of material fact as to her hostile-work-environment claim where those assertions were supported by evidence in interrogatories and deposition testimony that described in detail the specific remarks and the approximate dates on which they occurred throughout her term of employment).

In light of the foregoing, Fuelling has failed to create a genuine issue of material fact regarding the severity or pervasiveness of the alleged racially derogatory language. We therefore affirm the district court's grant of summary judgment to the defendants on Fuelling's claim of discrimination based on a hostile work environment.

**D.     Retaliation claim**

Title VII also "protects from retaliation employees who have opposed discriminatory employment practices." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (citing 42 U.S.C. § 2000e-3(a)). To make out a prima facie case of retaliation based on circumstantial evidence, a plaintiff must show that "(1) he [or she] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took [an] adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.*

The defendants do not dispute that the first, second, and third prongs are satisfied here based on the fact that Fuelling filed an EEOC charge in March of 2005, the defendants became aware of the EEOC charge at that time, and the defendants subsequently terminated Fuelling's employment in June of 2006. Whether Fuelling satisfied the causation requirement, however, is in dispute. To show causation, a plaintiff must "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal quotation marks omitted).

In this case, Fuelling filed an EEOC charge 15 months before her termination. She does not dispute that, under Sixth Circuit caselaw, a 15-month period between the protected activity and the adverse employment action is insufficient on its own to establish a causal connection. *See Dixon*, 481 F.3d at 334 (explaining that "this Court has typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity"). On the other hand, Fuelling correctly points out that "a mere lapse in time between the protected activity and the adverse employment action does not inevitably foreclose a finding of causality." *Id.* at 335.

22

Fuelling's argument that a causal connection exists despite this 15-month gap is based on the same allegations that she asserts in support of her disparate-treatment and hostile-work-environment discrimination claims. That is, she argues that Ward's purportedly disparate treatment of black and white employees is evidence of a causal connection, as is evidence of the "culture of racism and favoritism" allegedly created by Ward's discriminatory animus.

The district court, however, concluded that Fuelling provided no evidence of a causal connection between Ward's purported bias and Hymer's subsequent decision to terminate Fuelling. Specifically, the court found "no evidence that the information with which Hymer made her ultimate decision was in any way tainted by anyone's racial animus or as a result of Fuelling's [EEOC] charges." It particularly noted that Hymer's reasons for terminating Fuelling (primarily her submission of false reports against coworkers, but also complaints against Fuelling by law enforcement officers, pharmacy personnel, and coworkers) arose in the spring of 2006, "at a time considerably more proximate to the decision to fire her." The court thus determined that Fuelling had failed to establish either a prima facie case of retaliation or to show that Hymer's reasons for firing her were pretextual.

For the reasons discussed at length in Parts II.B.&C. above, we too find Fuelling's arguments on causation unpersuasive. We therefore affirm the district court's grant of summary judgment for the defendants on Fuelling's retaliation claim.

E.    **Claim for intentional infliction of emotional distress**

Fuelling's final claim is for intentional infliction of emotional distress under the common law of Ohio, arguing that the defendants' purportedly discriminatory conduct was extreme and outrageous. Even assuming, however, that the defendants were found liable for discriminating or

23

retaliating against Fuelling in violation of Title VII, "such a conclusion would not be enough [to establish intentional infliction of emotional distress], for it is well-established under Ohio law that discrimination, by itself, is insufficient to support an intentional infliction of emotional distress claim." *Baetzel v. Home Instead Senior Care*, 370 F. Supp. 2d 631, 644 (N.D. Ohio 2005); *see also Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) (explaining, in the context of the ADEA, that "an employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress.").

To state a claim for intentional infliction of emotional distress under Ohio common law, a plaintiff must show:

> (1) that the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it could be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of plaintiff's psychological injury, and (4) that the mental anguish suffered by the plaintiff was serious and of a nature that no reasonable man could be expected to endure it.

*Buckman-Peirson v. Brannon*, 2004 Ohio 6074, ¶ 29, 822 N.E.2d 830, 835 (Ohio Ct. App. 2004) (internal quotation marks omitted); *see also Baab v. AMR Servs. Corp.*, 811 F. Supp. 1246, 1269 (N.D. Ohio 1993) ("[T]o say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement.").

"[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Yeager v. Local Union 20*, 453 N.E.2d 666, 671 (Ohio 1983),

*abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007).  It has instead been found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.*; *see also Mowery v. City of Columbus*, 2006 Ohio 1153, ¶ 50 (finding that racial comments, jokes, and criticism—including statements about hating white people and wanting an all-black department—as well as the distribution of racially charged literature, were inappropriate for the workplace, but not so extreme and outrageous as to go beyond all bounds of human decency).

The district court found that although Fuelling had "at least alleged some insulting and inappropriate behavior" by the defendants, she had failed to raise a triable issue as to whether the conduct was extreme or outrageous.  We agree with the district court's analysis and affirm its grant of summary judgment to the defendants on this claim.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.