**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0997n.06
Filed: December 21, 2005

No. 04-6105

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

RONALD PLAUTZ,

      Plaintiff-Appellant,

         v.

JOHN E. POTTER, Postmaster General, in his
official capacity as Postmaster General, United States
Postal Service,

      Defendant-Appellee.

On Appeal from the United
States District Court for the
Western District of
Tennessee

—————————————————————————————/

**Before:**     **GUY and GIBBONS, Circuit Judges; and EDMUNDS, District Judge.**[*]

     **PER CURIAM.**    Plaintiff Ronald Plautz filed this disability discrimination suit

against his employer, the Postmaster General of the United States Postal Service (USPS),

claiming that the USPS violated the Americans with Disabilities Act (ADA), Title VII, and

the Tennessee Human Rights Act (THRA). The district court granted the USPS summary

judgment on all of Plautz's claims. We agree that Plautz's claims lack merit because none

of the alleged discriminatory acts were adverse employment actions and the acts collectively

---

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of
Michigan, sitting by designation.

did not amount to a constructive discharge or create a hostile work environment. Accordingly, we affirm.

**I.**

Ronald Plautz suffers from a spastic colon. He is usually able to control his condition through medication and diet, but stress exacerbates his condition. The USPS hired Plautz as a mail processor in 1986. One year later, Plautz became an Electronic Technician. In March of 2000, Phil Murphy, Plautz's former coworker, became his supervisor. On Murphy's first day as supervisor he told Plautz: "I think you took too many days of sick leave and have a pattern . . . Well, I think you were abusing your sick leave . . . Well, I know you, I worked right with you. You were just trying to burn your sick leave." Plautz responded that he had a chronic health condition that required him to stay home on the days he had called in sick. Murphy responded that if he was sick that often, he should request leave pursuant to the Family and Medical Leave Act (FMLA), and Murphy provided Plautz with the appropriate FMLA forms.

Murphy told Plautz on March 20 that he was issuing him an "official discussion" because of several unscheduled absences dating back to 1999. An official discussion is an official action that becomes part of an employee's employment record but is not a disciplinary action. Murphy also threatened an official investigation into each unscheduled absence. Plautz initiated an EEO complaint on March 21, 2000, because he felt that Murphy was determined to take some sort of negative employment action against him. Plautz did not pursue the complaint because allegedly he feared retaliation.

Plautz returned completed FMLA forms on March 25, 2000. His doctor stated on the forms that Plautz had a chronic lifetime disease, spastic colon, and that he would be unable to work periodically for two or three days at a time, depending on his symptoms.[1] His FMLA request was approved.[2]

In April of 2000, Maintenance Manager Andy Cuccia saw Plautz standing outside the break room with a coworker who was drinking coffee. Cuccia told them that they were not supposed to drink coffee on the workroom floor. Ten minutes later, Plautz and his coworker were called into the office to meet with Murphy. Murphy told them he was giving them both an official discussion for drinking coffee on the workroom floor.

The next allegedly discriminatory event took place one year later, in the spring of 2001, when Cuccia saw Plautz viewing a nonwork-related website on the office computer. Cuccia printed the page that Plautz was viewing and showed it to Mike Milner, the acting supervisor. On Cuccia's direction, Milner wrote an investigative interview report about the incident. Cuccia insisted that Milner issue a warning letter to Plautz, but Milner convinced Cuccia that a warning letter was too extreme for a common practice that is rarely punished, and that an official discussion was more appropriate.

Plautz requested and received approval for two sick days on June 25 and 26, 2001. On Wednesday, June 27, 2001, Plautz was prepared to return to work when he received a

---

[1]Employees may use FMLA leave in parts, called "intermittent leave." Federal regulations define "intermittent leave" as "FMLA leave taken in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.203(a).

[2]The record is unclear if the approval of the forms submitted in March of 2000 was approval for future FMLA leave or also approval to qualify past absences as FMLA leave.

letter in the mail from the USPS requesting a new doctor's report in order to recertify him for FMLA leave. The letter upset Plautz to the point that he could not work, and he called the FMLA coordinator to report that he needed an additional day of FMLA leave. Plautz's regular work schedule required him to work Saturday through Wednesday, so the next two days were Plautz's regular days off. When he returned to work on Saturday, a supervisor, Marcus Seymour, asked if he was sick Wednesday because Attendance Control reported FMLA sick absences for Monday and Tuesday, but not Wednesday.

The next day, Seymour pulled Plautz aside and told him that Cuccia planned on suspending him because he was "AWOL" on Wednesday. Seymour and Plautz went to the Attendance Control office together and found the record of Plautz's call on Wednesday, which proved he had not been AWOL.

Seymour orally reprimanded Plautz on July 4, 2001, as to proper radio etiquette. An oral reprimand is less severe than an official discussion and is not considered discipline. The incident occurred because Plautz could not understand an employee transmitting a question on the radio. Plautz stated, "Ma'am, if you would please calm down, maybe somebody can understand what you're saying." Seymour responded over the radio, "Mr. Plautz, that is totally inappropriate." According to Plautz, Cuccia was sitting next to Seymour and instructed Seymour to reprimand Plautz even though Seymour did not think Plautz did anything wrong.

The following Friday, July 6, 2001, Plautz's paycheck did not include one day's pay because USPS mistakenly thought he had been AWOL. The USPS admitted its error and restored the pay in Plautz's next paycheck. The missing day's pay upset Plautz which

exacerbated his condition.  His doctor documented that Plautz could not work for one month.

Plautz called his supervisor and the FMLA coordinator to report that he would not return for

thirty days because of stress.  Plautz then contacted his union and the EEOC to inquire about

a possible complaint or grievance.  After his return to work, Milner told Plautz that the USPS

was going through his medical records trying to find a way to discredit him.  Plautz felt that

Cuccia was "stalking" him by hanging around Plautz's work area and watching him.

Defendant changed Cuccia's schedule so that he and Plautz were not working the same

hours, allegedly to avoid conflict between Cuccia and Plautz.  As a result of these events,

Plautz experienced significant stress and his doctor approved a three-month leave of absence

because of the stress.[3]  Plautz subsequently resigned his position on April 30, 2003.  At no

time did the USPS pursue any formal disciplinary action against Plautz.

Plautz filed a complaint on September 12, 2001, with the EEOC.  On April 24, 2003,

not having received a final decision on his complaint from the EEOC,  Plautz filed this action

against the USPS, alleging that the USPS violated the ADA, Title VII, and the THRA.

Defendant moved to dismiss or, in the alternative, for summary judgment.  The district court

granted the motion for summary judgment on the federal claims because Plautz failed to

show that he suffered from an adverse employment action, a necessary element of his

discrimination and retaliation claims, or that hostility toward his disability at work was

severe and pervasive enough to support a hostile work environment claim. The district court

also dismissed the THRA claim because federal employment statutes provide the exclusive

---

[3]The record does not indicate the beginning and end dates of Plautz's leave.

remedy for employment discrimination claims advanced by federal employees.[4] Plautz filed

a motion for reconsideration, in which he argued for the first time that he was constructively

discharged. The district court denied the motion. Plautz then filed this appeal of both orders.

## II.

We review *de novo* the district court's grant of summary judgment. *Smith v.*
*Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there

are no issues of material fact in dispute and the moving party is entitled to judgment as a

matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court

must view the factual evidence and draw all reasonable inferences in favor of the nonmoving

party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

On appeal, Plautz relies in part on the affidavit he filed with his motion for

reconsideration—evidence that was not submitted to the district court until after it granted

defendant's motion for summary judgment. Accordingly, we will not consider it in our

review of the district court's order granting summary judgment, but only in our review of the

district court's denial of Plautz's motion for reconsideration.

## A.      Order Granting Summary Judgment

Initially, we note that Plautz incorrectly brought his disability claims under the ADA.

The Rehabilitation Act is a federal employee's exclusive remedy for employment related

discrimination based on a disability. *See* 42 U.S.C. § 12111(5)(B) (defining employers under

the ADA, and excluding the United States or a corporation wholly owned by the United

---

[4]Plautz does not appeal the dismissal of his THRA claim.

States government as a covered employer). *See also Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004) ("the Rehabilitation Act, 29 U.S.C. § 791, et seq. . . . provides the remedy for federal employees alleging disability discrimination"); *Felder v. Runyon*, No. 00-1011, 2000 WL 1478145, at *1 (6th Cir. Sept. 26, 2000) (unpublished decision) ("the [Rehabilitation] Act is the exclusive means for a federal employee to bring a claim of disability discrimination in federal court"); *Calero-Cerezo v. United States Dept. of Justice*, 355 F.3d 6, 11 n.1 (1st Cir. 2004) (stating that the ADA is not available to federal employees). Therefore, we will construe Plautz's ADA claim as a Rehabilitation Act claim. There is no significant difference between the substantive standards of the ADA and the Rehabilitation Act as they relate to this case. The Rehabilitation Act expressly provides: "The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment." 29 U.S.C. § 791(g) (1999). *See also Calero-Cerezo*, 355 F.3d at 11 (holding that the same standards apply to claims under the ADA and under the Rehabilitation Act). Therefore construing the ADA claim as a Rehabilitation Act claim does not significantly alter the legal analysis of Plautz's claims.

The parties and the district court analyzed Plautz's retaliation claim as a claim brought under Title VII of the Civil Rights Act of 1964, but the Rehabilitation Act itself prohibits retaliation in employment against disabled persons: "Significantly, the anti-retaliation

provision of the Rehabilitation Act, which incorporates by reference § 12203(a) of the ADA, provides in relevant part that '[n]o person shall discriminate against an individual because such individual has opposed any act or practice made unlawful by this Act.' 29 U.S.C. § 794(a) (1994)." *Hiler v. Brown*, 177 F.3d 542, 545 (6th Cir. 1999). With the proper analytical framework now in place, we turn to the substance of Plautz's claims.

### 1.      Discrimination Based on Disability

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). We apply the burden shifting framework developed for claims of discrimination under Title VII for claims of disability discrimination under the Rehabilitation Act. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). The plaintiff has the initial burden to set forth a *prima facie* case of discrimination. *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *Id*. If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The ultimate burden of persuasion remains at all times with the plaintiff. *Id*.

To establish his *prima facie* case of discrimination, Plautz must show (1) that he was an individual with a disability,[5] (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation, and (3) who was discriminated against solely because of the disability. *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002). In a case such as this, the third element requires a plaintiff to have suffered an adverse employment action. *See Smith v. Henderson*, 376 F.3d 529 (6th Cir. 2004). The parties dispute only whether Plautz suffered an adverse employment action. An adverse employment action is a "'materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct.'" *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004), quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).

Plautz contends the following events constitute adverse employment actions:

(1) Plautz was told he took too much sick leave;

(2) Cuccia instructed the supervisor for the day to give Plautz an official discussion for drinking coffee on the workfloor;

(3) Cuccia instructed the supervisor for the day to discipline Plautz for using the computer for improper purposes. Instead of issuing a disciplinary action, the supervisor gave Plautz another official discussion;

(4) the USPS requested recertification from Plautz's doctor;

---

[5] The parties do not dispute that Plautz's condition renders him disabled under the Rehabilitation Act.

(5) Cuccia mistakenly thought Plautz had taken an unapproved day off and temporarily docked him one day's pay;

(6) when Plautz returned to work from a stress leave, USPS chastised him by telling him he had "started an epidemic" of people taking stress leaves;

(7) Plautz was told he communicated improperly with a coworker;

(8) Plautz was told that Cuccia was out to get him by going through his military records and looking for a reason to terminate or discipline him.

Plautz contends that each of these is an adverse employment action, or alternatively they collectively amount to a constructive discharge. Plautz has admitted that official discussions are not disciplinary actions, and that he never received any disciplinary action during his tenure at the USPS. There is no evidence that the official discussions had any tangible impact on Plautz's employment. They are not "tangible employment action[s] [that] constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Cuccia's threats to discharge or discipline Plautz were not adverse employment actions because it is settled in this circuit that a threat to discharge is not an adverse employment action. *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999).

Regarding the USPS's docking of one-day's wages from Plautz's paycheck for one pay period, we have held that taking away an employee's wages for one month, even though it was later reinstated, rises to the level of an adverse employment action. *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 802 (6th Cir. 2004) (en banc), *cert. granted*

*in part*, __ S. Ct. __ (2005). The *White* court emphasized that the adverse-employment-action element was designed to filter out discrimination cases that caused "merely inconvenience" or a "bruised ego." We concluded that not having any income for one month goes beyond inconvenience. *Id* (internal quotation marks and citation omitted). In this case, the postponement of one-day's pay for one pay period had only a negligible impact on Plautz's income and does not rise to the level of an adverse employment action. *See Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (holding that a plaintiff in a sex discrimination suit did not suffer an adverse employment action where her employer withheld one day's pay and it was not reinstated).

Moreover, the events listed above do not amount to a constructive discharge. A finding of constructive discharge requires employment conditions to be objectively intolerable to a reasonable employee. *Smith v. Henderson*, 376 F.3d 529, 533-34 (6th Cir. 2004). In *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001), an age discrimination case, we held that we should consider the following relevant factors in determining a constructive discharge claim:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

For example, we have held that an employee was constructively discharged when he reasonably believed his termination or demotion was imminent, *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002) (termination); *Saroli v. Automation and Modular*

*Components, Inc.*, 405 F.3d 446, 452 (6th Cir. 2005) (demotion), and when the employer

isolated the employee by instructing other employees not to talk or interact with him, *Moore*

*v. KUKA Welding Sys. and Robot Corp.*, 171 F.3d 1073, 1080-81 (6th Cir. 1999).  On the

other hand, the manner in which an employer criticizes an employee's job performance, such

as attendance, is insufficient to establish constructive discharge.  *Smith,* 376 F.3d at 534.  *See*

*also Agnew v. BASF Corp.*, 286 F.3d 307 (6th Cir. 2002) (holding that a low performance

rating does not constitute constructive discharge); *Caslin v. Gen. Elec. Co.*, 696 F.2d 45, 47

(6th Cir. 1982) (same).  Most of the events of which Plautz complains were criticisms of his

performance or attendance.  Moreover, Cuccia's alleged threat to review Plautz's records to

look for a justification to terminate him, relayed to Plautz by a coworker and as an expression

of the coworker's speculation as to why Cuccia was reviewing Plautz's employment records,

is too speculative to support the conclusion that Plautz's firing was imminent.

### 2.        Hostile Work Environment

We borrow the standard for a hostile work environment claim under the Rehabilitation

Act from the ADA.  Under the ADA, a hostile work environment claim requires a plaintiff

to demonstrate five elements:  (1) he was disabled; (2) he was subject to unwelcome

harassment; (3) the harassment was based on his disability; (4) the harassment unreasonably

interfered with his work performance; and (5) defendant either knew or should have known

about the harassment and failed to take corrective measures.  *See Blankenship v. Parke Care*

*Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir.1997) (establishing the framework of proof under Title

VII for sexual harassment); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir.1996)

(holding that the elements of a hostile work environment claim are the same across

discrimination contexts and applying those elements specifically to the Age Discrimination in Employment Act).

The Supreme Court has explained that for a plaintiff to have suffered from a hostile work environment, the plaintiff's workplace must have been "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). We must consider all the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks and citation omitted).

Plautz contends that the events discussed previously created a hostile work environment. Most of the allegations are examples of Plautz's superiors discussing performance related problems with him. We have previously held that "[c]onversations between an employee and his superiors about his performance does not constitute harassment simply because they cause the employee distress." *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998). There is no evidence that Plautz was ridiculed or insulted because of his medical condition to the point that it permeated his work environment. We agree with the district court that no reasonable trier of fact could find that Plautz suffered from a hostile work environment.

Plautz also argues that the severe and pervasive nature of Cuccia's harassment amounted to hostile environment constructive discharge. He relies on a Supreme Court decision, *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004), for creating this type of constructive discharge. In *Suders*, the Supreme Court explicitly held what the circuit courts had been in agreement about for years: an employer can be liable under Title VII for constructive discharge when workplace "conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Id*. at 141. In other words, workplace harassment that is severe and pervasive enough to create a hostile work environment may in some circumstances constructively discharge the employee. The more difficult issue of the case was whether, in sexual harassment cases, a constructive discharge is a "tangible" employment action, precluding certain affirmative defenses that are available to employers when harassment does not result in a tangible action. The Court concluded that constructive discharge, while a potential liability-incurring employment action for the employer, is not a "tangible employment action" in sexual harassment cases. Therefore the affirmative defenses available to employers in non-tangible action cases are available in constructive discharge cases. *Id*. at 141. Plautz places great importance on the Court's first holding, and argues that the harassment in this case was significant enough to render his resignation a constructive discharge. We have already decided that the complained of actions do not rise to the level of creating a hostile work environment, and therefore they necessarily do not rise to the level of compelling a reasonable person to resign.

### 3.      Retaliation

Plautz also claims that the USPS retaliated against him for filing his 2000 EEO complaint. Plautz must satisfy the following four elements to make out a *prima facie* case of retaliation for exercising rights protected by the Rehabilitation Act: (1) he engaged in legally protected activity; (2) the USPS knew about Plautz's exercise of this right; (3) the USPS then took an adverse employment action against Plautz; and (4) the protected activity and the adverse employment action are causally connected. *Gribcheck*, 245 F.3d at 550. The definition of an adverse employment action is identical to that used in Plautz's direct discrimination claim. *White*, 364 F.3d at 799. Since we have already decided that the facts do not support a finding of an adverse employment action in that context, we also conclude that there was no adverse employment action in the context of Plautz's retaliation claim.

### 4.      The Affidavit Attached to the Motion for Reconsideration

We review for abuse of discretion a district court's refusal to consider evidence produced for the first time on a motion to reconsider. *Huff v. Metro. Life Ins. Co.*, 675 F.2d 119, 123 (6th Cir. 1982). "It is well established . . . that a district court does not abuse its discretion in denying a Rule 59 motion when it is premised on evidence that the party had in his control prior to the original entry of judgment." *Emmons v. McLaughlin*, 874 F.2d 351, 358 (6th Cir. 1989).

Plautz attached an affidavit to his motion for reconsideration which added the following allegedly discriminatory events to the list previously discussed:

(1) The plant manager held a general meeting on March 24, 2000, to chastise employees for using sick leave and FMLA leave. After the meeting, the general

manager told all the supervisors to provide the names of all employees who turned in FMLA forms after the meeting.

(2) Plautz was denied access to the tools necessary to perform his job.

(3) Plautz's name was removed from the time card area.

(4) Plautz was isolated from his coworkers because they were told not to talk to him.

Plautz had that evidence in his control when he responded to the motion for summary judgment but he simply failed to submit those facts to the district court for consideration before rendering judgment against him. Therefore, the district court did not abuse its discretion by refusing to consider Plautz's affidavit.

**AFFIRMED.**