**Joe B. COOPER, Plaintiff,**

v.

**JACKSON–MADISON COUNTY GENERAL HOSPITAL DISTRICT, Defendant.**

No. 1:09–cv–01115–JDB–egb.

United States District Court,
W.D. Tennessee,
Eastern Division.

Sept. 28, 2010.

Elizabeth G. Ford, The Law Offices of Louis W. Ringger, Jackson, TN, for Plaintiff.

John D. Burleson, Jesse Daniel Nelson, Rainey Kizer Reviere & Bell, Jackson, TN, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

J. DANIEL BREEN, District Judge.

On May 12, 2009, the Plaintiff, Joe B. Cooper, brought this action against the Defendant, Jackson–Madison County General Hospital District ("JMCGHD"), alleging employment discrimination on the basis of race, color, and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e. Before the Court is the Defendant's motion for summary judgment pursuant to Rule 56 of the Fed-eral Rules of Civil Procedure. (Docket Entry ("D.E.") No. 26.) The Plaintiff responded to the motion, and the Defendant replied to the Plaintiff's response. (D.E. Nos. 34, 35.) For the reasons stated herein, the Defendant's motion is GRANTED.

## FACTUAL BACKGROUND

The Plaintiff was employed as a licensed clinical social worker at Pathways of Tennessee, Inc., a non-profit corporation of which JMCGHD is the sole shareholder. He was employed in that position from September 25, 2006, until he resigned on August 10, 2007. Although Cooper operated primarily out of Pathways' Dyersburg, Tennessee facility, he also worked in Pathways' Brownsville, Tennessee facility one day per week. He was the only licensed clinical social worker in Brownsville.[1] (Depo. of Joe B. Cooper 11, D.E. No. 26–4.) The Plaintiff's allegations of discrimination stem from his relationship with Sheila Odom, the Director of the Brownsville office and his supervisor there. (*Id.* at 12.)

Prior to accepting his position with Pathways, the Plaintiff had received multiple warnings concerning Odom and the difficulties of working in the Brownsville office. (*Id.* at 7.) Janice Matthews, a former Pathways employee and friend of the Plaintiff, advised him that working in Brownsville "was difficult, that she felt unwanted" and "that everybody hated going." (*Id.* at 6.) According to the Plaintiff, Matthews told him that "[t]he whole system was set up differently" in Brownsville, including paperwork and assignment of job responsibilities. (*Id.*) He related that Mat-

---

1. At the beginning of Plaintiff's employment, Pathways employed six other persons in Brownsville, all of whom were African–American females. (*Id.* at 16–17.) Among those six, Sheila Odom was the director, another was a part-time therapist, two were case man-agers, and one was an office staffer. (*Id.*) About six months into Plaintiff's tenure, Pathways placed an additional case worker in Brownsville who was a Caucasian female. (*Id.*)

thews described Odom as a "rude, . . . angry woman." (*Id.* at 7.) Similarly, Cliff Nathaniel, the Director of the Dyersburg and Tiptonville offices, told him that "Sheila can be difficult" and that many people had been sent to Brownsville but had not worked out. (*Id.* at 12.) However, neither Matthews nor Nathaniel indicated that Odom was a racist or that he would be treated poorly due to his race. (*Id.* at 13.)

After accepting his position, the Plaintiff claims that he received other admonitions about Odom and about working in Brownsville from the Dyersburg staff. (*Id.*) He acknowledges, however, that the staff's concerns about her stemmed from his professional qualifications rather than his race. (*Id.*) According to the Plaintiff, "[t]he thing that they felt would probably be giving me trouble was that since she wasn't qualified to be . . . the director, they felt that she might see me as a threat." (*Id.*) As a licensed clinical social worker, Cooper had higher qualifications than Odom, and the Dyersburg staff thought she might view him as one who would vie for her position. (*Id.*)

During the early part of his time in Brownsville, the Plaintiff characterizes Odom's demeanor towards him as "condescending," "uncooperative," and "openly hostile." (*Id.* at 16, 17.) He states that upon arriving in Brownsville on his first day, she denied knowing that he would be working there and failed to give him any orientation of the office. As early as his third visit, Cooper verbally complained to Nathaniel about Odom's attitude toward him. (*Id.* at 17.) The Plaintiff alleges that by his third, fourth, or fifth visit, Odom had interfered with his care of patients and refused to answer questions about patients.(*Id.*) He claims that she would bring him her own work such as treatment plans and other forms to complete. (*Id.*) On one particular occasion, the Plaintiff contends that Odom "walked into [his] office when

[he] had a patient, threw a chart on [his] desk, saying, 'He's Medicare. I can sit on my happy ass for an hour.'" (*Id.*) Cooper further avers that Odom regularly spoke badly of him in front of other employees. (*Id.*) Perhaps most significant in this case, the Plaintiff states that Odom regularly referred to him as "whitey" or "white boy" and on one occasion told him to "get [his] white ass out of [his] fine car." (*Id.* at 18, 19.)

The Plaintiff noted that he spoke with Cliff Nathaniel two to three times a month about the situation with his supervisor in Brownsville. (*Id.* at 20.) However, Cooper did not inform Nathaniel about the severity of the racial references and because he was African–American, "race [wa]s just not an issue with [Nathaniel] at all," and he "didn't want to put [Nathaniel] in the middle of it." (*Id.* at 18, 20.) Although the Plaintiff made requests to stop working out of the Brownsville facility, Nathaniel informed him that he would have to continue because no other licensed social workers were available to travel there. (*Id.* at 19, 20–21.)

The Plaintiff maintained that his problems with Odom intensified over time. (*Id.* at 21.) On July 27, 2007, he filed a written complaint with Nathaniel which was forwarded to the Pathways Human Resources Department and received on August 8, 2007. (D.E. No. 34–1, at ¶ 7.) In that complaint, Cooper detailed his difficulties with Odom:

As we have discussed several times there have been problems with my relationship with Sheila Odom since the start of my employment with Pathways last year.

-On my second day I was told to report to work at 9am instead of 8am when I had arrived. She stated that she did not like to get up and that she would have to see clients at 8 if I did. I was also told

that I could leave at 4pm if my last appointment did not show. I have followed her directions.

-Sheila made no attempt to involve me as a staff member. I have yet to be invited to eat with them in their daily luncheon for example—this is minor but telling of her attitude from the beginning.

-Sheila's voice is loud and carries easily in the building. I became used to not being spoken to and actually it was more pleasant that way. I heard myself being referred to as "whitey" and "that white boy" on a regular basis. This was not done in a playful but rather a demeaning way. At times it was clear that she wanted me to hear her. Initially it was infrequent but gradually escalated. At that time I was the only white and the only male in the facility. These racial remarks ceased suddenly recently when another white employee was hired and I was hoping for the best. It was not to come. I was [sic] now referred to by my first name although I repeatedly asked to go by my middle name but at least it was an improvement.

In recent weeks the incidents have worsened.

-I was asked to return my office key with no explanation given.

-On 7–16 I was doing one of my three intakes in the afternoon when Sheila entered my office without knocking as usual. She slammed a chart on my desk and said "He's Medicare and your problem. This means I can sit on my happy ass for an hour." Luckily the client was mentally challenged and did not seem to see the inappropriateness of this.

-Twice in the last few weeks—I don't remember the dates I have tried to discuss two intakes with Sheila that she had done. Each time she put her hand to my face and told me "never ask me about a patient again" and walked away.

-On 7–23 the problem came to a head. When I entered the office at 9am Sheila was obviously angry and said she wanted to see me in my "so-called office." When we sat down she said" [sic] What makes you think you can bring your white ass in that fancy car in here whenever you want?" I reminded her of the initial hours she told me to come and she said she did not remember. Gave no reply when I asked why she had let me continue if it was wrong. The conversation deteriorated and my job was threatened. She then said it didn't matter if we got along or not as she was leaving soon to go manage a hospital. Finally the situation calmed and I asked her to start over and to give me a hug and call me by my name—she did so and I thought things were better. Shortly afterwards I was told by three of the four staff present (two in person and one by phone) that they were told by Sheila not to talk to me unless it was strictly business or they would be written up.

I do not expect the Brownsville staff to back me up at all. They are completely bullied by Sheila and will do anything to stay out of controversy. This stems in great part to Sheila telling them often that Pam is her best friend and that she can do as she pleases. They believe her. These are some good people simply caught up in a bad situation and I am not trying to draw them into anything. When they can they have been helpful and totally considerate of me. No racial references have been made by them at all. When I ask for assistance when Sheila is not around I get it.

I am sorry to have bring this to you but I feel I have taken more than enough. Extremely low volume of appointments have affected my productivity—for example I had only three scheduled last week. Sheila's solution has been to load me down with Tenn Care clients or to do

her and Catherine's treatment plans[,] CRG's[,] etc. I don't mind intakes but I do not feel I should [be] expected to do others' paperwork when I know there is ample time for her to do her own. I know there has to be someone with a license at Brownsville but I feel that I have done my tour of duty and its someone else's time. The relationship with Sheila is damaged beyond repair. I am booked out almost seven weeks in Dyersburg and six in Tiptonville—time that could easily be more utilized there. I feel that being booked much more out could damage my caseload that is working.

(D.E. No. 26–4.)

On August 9, 2007, Dennis Williams, a Pathways Human Resources manager, initiated an investigation into the Plaintiff's complaint. (D.E. No. 34–1, at ¶ 9.) Williams determined that "Mr. Cooper's claims of racial discrimination/harassment were investigated and were not validated. His claim of problems existing between him and Ms. Odom[ ] appear to have validity." (D.E. No. 26–2, at 6.) On August 10, 2007, before Williams' investigation was complete, the Plaintiff submitted a written resignation to Pathways. (D.E. No. 34–1, at ¶ 15.)

Cooper filed a charge of discrimination with the Equal Employment Opportunity Commission on or about February 26, 2008. (D.E. No. 26–5.) In it, the Plaintiff alleged that he "was discriminated against and subjected to racially derogatory comments because of [his] race, White, in violation of Title VII of the Civil Rights Act of 1964, as amended" and checked the box for discrimination based on "race." (*Id.*) The Plaintiff subsequently brought his claim against the Defendant to this Court where he more broadly asserted that "Defendant's conduct [was] discriminatory with regard to Plaintiff's race, sex and color." (D.E. No. 1 at 2.) Cooper's com-

plaint averred that Odom "harassed [him] on an ongoing basis, created a hostile work environment, and effectuated his constructive discharge." (*Id.*) JMCGHD has moved for summary judgment on the basis that there are no material issues of disputed fact and that it is entitled to judgment as a matter of law.

## STANDARD OF REVIEW

Rule 56 provides in pertinent part that [t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c)(2); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.,* 862 F.2d 597, 601 (6th Cir.1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct.

2505, 2512, 91 L.Ed.2d 202 (1986). "The judge may not make credibility determinations or weigh the evidence." *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir.1994).

## ANALYSIS

### I. Sex and Color Discrimination

In his EEOC charge, Cooper only checked the box for discrimination based on "race." However, his complaint alleges discrimination on the basis of "race, sex and color." (D.E. No. 1 at 3.) In the instant motion, JMCGHD argues that the Plaintiff's claims of discrimination on the basis "sex" and "color" must be dismissed for failure to submit them to the EEOC. Plaintiff does not respond to his alleged failure to charge sex discrimination with the EEOC but asserts that his claim of discrimination based on "color" should remain because "color is substantially the same as race for the purposes of this suit." (D.E. No. 34 at 1.)

■ "In Title VII, Congress set up an elaborate administrative procedure, implemented through the EEOC, that is designed to assist in the investigation of claims of ... discrimination in the workplace and to work towards the resolution of these claims through conciliation rather than litigation." *Granderson v. Univ. of Mich.*, 211 Fed.Appx. 398, 400 (6th Cir. 2006); *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1024 (8th Cir.2004), *reh'g & reh'g* en banc *denied* (Aug. 5, 2004). An individual seeking to bring a Title VII discrimination claim in federal court must first exhaust her administrative remedies. *Scott v. Eastman Chem. Co.*, 275 Fed.Appx. 466, 470–71 (6th Cir.2008); *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 379 (6th Cir.2002). However, "the requirement 'is not meant to be overly rigid, nor should it result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading.'" *Scott*, 275 Fed.Appx. at 471 (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir.2006)). Thus, "the EEOC complaint should be liberally construed to encompass all claims reasonably expected to grow out of the charge of discrimination." *Randolph*, 453 F.3d at 732 (citation and internal quotation marks omitted). "[W]here facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir.2004) (citation and internal quotation marks omitted). Moreover, "[w]hen the EEOC investigation of one charge *in fact* reveals evidence of a different type of discrimination against the plaintiff, a lawsuit based on the newly understood claim will not be barred." *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir.1998).

The Sixth Circuit Court of Appeals requires a "broad reading of the charge because most Title VII claimants are unschooled in the technicalities of the law and proceed without counsel." *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir.1991). "[W]here the claimant is unrepresented, a 'broader reading of the charge ... is compelled.'" *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005) (quoting *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 832 (6th Cir.1999)). This does not mean, however, that "plaintiffs are excused from filing charges on a particular discrimination claim before suing in federal court." *Johnson v. Rumsfeld*, 238 Fed.Appx. 105, 108 (6th Cir.2007) (quoting *Davis*, 157 F.3d at 463).

There is no evidence in the record to suggest that the Plaintiff was represented by counsel at the time of filing his Charge of Discrimination with the EEOC.

JMCGHD even suggests in its memorandum of law that the Plaintiff prepared the charge without the aid of counsel.[2] Thus, the Court is to read the charge broadly. In the portion of the EEOC form provided for the complainant to explain the grounds of the charge, the Plaintiff stated as follows:

I was subjected to harassment because of my race, by the Black female Director at the facility I worked.
The Black female Director referred to me as "whitey or white boy" constantly. I was the only White employee and the Black employees were not subjected to similar comments from the Black female Director.
Prior to resigning to accept a better job, I complained to company officials and was told my complaint was verified, but to my knowledge, no action was taken to prevent the comments to make to [sic] other persons.
I believe that I was discriminated against and subjected to racially derogatory comments because of my race, White, in violation of Title VII of the Civil Rights Act of 1964, as amended.

■ The Court will first address the Plaintiff's claim of sex discrimination. Although Cooper noted Odom's sex in his charge, he clearly stated that the basis of the alleged discrimination and harassment was race. He neither checked the box for discrimination based on sex, nor asserted in his explanation of the particulars of the charge that he was targeted because he was a male. Moreover, a charge of sex discrimination is not the type that would be expected to reasonably grow out of a charge of race discrimination. *See, e.g., Moore v. Food Lion,* No. 3:06–0712, 2007 WL 596955, at *2 (M.D.Tenn. Feb. 21,

2007) (plaintiff's claim of sex discrimination should not reasonably be expected to arise from an EEOC charge of race discrimination); *Reynolds v. Solectron Global Servs.,* 358 F.Supp.2d 688, 692–93 (W.D.Tenn. 2005) (plaintiff's assertion of race discrimination should not reasonably be expected to grow out of EEOC charge of sex discrimination); *Sain v. Am. Red Cross,* 233 F.Supp.2d 923, 930–31 (S.D.Ohio 2002) (same). Further, there is no evidence to suggest that the EEOC's investigation revealed facts supporting a claim of sex discrimination. As a result, the Plaintiff has failed to exhaust his administrative remedies on the claim of sex discrimination. It is therefore dismissed.

■ Likewise, Cooper's allegation of color discrimination must be dismissed. Although "race" and "color" were not defined by Congress in Title VII, interpretive guidance issued by the EEOC makes clear that the two terms are not synonymous. *See* EEOC Compliance Manual, Section 15–II, III (Apr. 19, 2006). The EEOC explains:

Title VII prohibits employment discrimination because of "color" as a basis separately listed in the statute. The statute does not define "color." The courts and the Commission read "color" to have its commonly understood meaning—pigmentation, complexion, or skin shade or tone. Thus, color discrimination occurs when a person is discriminated against based on the lightness, darkness, or other color characteristic of the person. Even though race and color clearly overlap, they are not synonymous. Thus, color discrimination can occur between persons of different races or ethnicities, or

---

2. In arguing that the Plaintiff's claims of gender and color discrimination should be dismissed, JMCGHD points out that "Cooper possesses a graduate degree and was able to specifically describe the facts of his allegations, even citing the statutory provision under which he was bringing his complaint." (D.E. No. 26–3 at 5.)

between persons of the same race or ethnicity.

*Id.* at 15–6. Previous courts have found that "color discrimination is distinct from race discrimination in that the former 'arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African–American individual is discriminated against in favor of a light-colored African–American individual.'" *Moore*, 2007 WL 596955, at *2 (quoting *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 n. 5 (4th Cir.2002)).

■ The thrust of Plaintiff's allegations is that he was discriminated against by an African–American director because of his Caucasian race. His allegations do not suggest that he was discriminated against because he was, for example, a fair-skinned Caucasian. Thus, following the reasoning of the district court's decision in *Moore v. Food Lion* and the EEOC's compliance manual, Plaintiff's allegations might support a claim of race discrimination, but not one based on color. His assertion that "color is substantially the same as race for the purposes of this suit" is incorrect. Cooper has failed to exhaust his administrative remedies with regard to discrimination based on color and that claim must also be dismissed.

## II.  Reverse Discrimination

■ A discrimination claim may be shown by direct or circumstantial evidence. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th Cir.2005). In cases such as this one, where there is a lack of direct evidence, courts review Title VII employment discrimination cases using the United States Supreme Court's well-established analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. 1817. The Supreme Court has acknowledged, however, that the varying factual scenarios arising under Title VII may render portions of this standard inapplicable in some cases. *Id.* at 802 n. 13, 93 S.Ct. 1817. Thus, courts have "modified [this analytical framework] to accommodate different employment discrimination contexts." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir.1985). Courts use the *McDonnell Douglas* framework "to address disparate treatment cases involving all discrimination prohibited by the Act in promotion, hiring, firing, compensation or other conditions of employment." *Id.* In the instant case, Cooper has argued that he "was exposed to disadvantageous terms or conditions of employment to which other employees, who were of a different race, were not exposed" and that he was constructively discharged. He may establish an adverse employment action by proving that he was constructively discharged. *Logan v. Denny's Inc.*, 259 F.3d 558, 568 (6th Cir.2001) ("One of the elements [of a prima facie Title VII discrimination claim] ... is that Plaintiff suffered an adverse employment action. Plaintiff may establish an adverse employment action by demonstrating that she was constructively discharged.").

■ Although Plaintiff is a white male, his majority status does not preclude

him from bringing suit for employment discrimination under Title VII. Rather, Title VII prohibits discrimination against members of both minority and majority groups. *Murray,* 770 F.2d at 67. For a majority plaintiff to succeed in an employment discrimination case, the plaintiff must establish a prima facie case of "reverse discrimination." Doing so requires the majority plaintiff to prove that "he was intentionally discriminated against 'despite his majority status.'" *Id.* In *Murray,* the Sixth Circuit modified the *McDonnell Douglas* framework and set out a two prong test for "reverse discrimination" cases:

> [A] prima facie case of "reverse discrimination" is established upon a showing that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority;" and upon a showing that the employer treated differently employees who were similarly situated but not members of the protected group.

*Id.* (citations omitted); *see also Arendale v. City of Memphis,* 519 F.3d 587, 603 (6th Cir.2008); *Zambetti v. Cuyahoga Cmty. Coll.,* 314 F.3d 249, 255 (6th Cir.2002).

The Court must initially determine whether the plaintiff has sufficiently shown "background circumstances [that] support the suspicion that the defendant is the unusual employer who discriminates against the majority." *Murray,* 770 F.2d at 67. "Recent Sixth Circuit precedent suggests, in the context of reverse discrimination claims, that the mere fact that an adverse employment decision was made by

a member of a racial minority is sufficient to establish the first prong of the *prima facie* case." *Arendale,* 519 F.3d at 603. In *Zambetti,* the plaintiff, a Caucasian police officer, alleged that the defendant, an African–American chief of police, passed him over for promotions for discriminatory reasons. 314 F.3d at 252–53. The Sixth Circuit found that the defendant's race alone was sufficient to satisfy the "background circumstances" prong of the test. *Id.* at 257 ("[T]he person in charge of hiring for CCC, Chief Harris, was himself African–American. This is sufficient, in our opinion, to satisfy *Murray's* 'background circumstances' requirement."). Similarly, in *Morris v. Family Dollar Stores of Ohio, Inc.,* 320 Fed.Appx. 330, 340 (6th Cir.2009), the Sixth Circuit held that a Caucasian employee established "background circumstances" simply "by showing that [his supervisor] is Hispanic and that he replaced [the employee] with an [sic] Hispanic employee."

■■■ Cooper contends that Sheila Odom's treatment toward him was so severe that he was constructively discharged and thus suffered an adverse employment action. Here, as in *Zambetti* and *Morris,* "the mere fact that an adverse employment decision was made by a member of a racial minority is sufficient to establish the first prong of the *prima facie* case." *Arendale,* 519 F.3d at 603. Thus, the fact that Sheila Odom, the Plaintiff's Brownsville supervisor, is an African–American is sufficient to satisfy *Murray's* "background circumstances" prong.[3]

3. Rather than arguing the reasons why he has established a prima facie case of reverse discrimination, the Plaintiff instead chooses to attack the "background circumstances" prong of the prima facie case. Plaintiff points to *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 801 n. 7 (6th Cir.1994), a case in which the Sixth Circuit expressed doubt about the merits of requiring majority plain-

tiffs to prove "background circumstances." However, the Sixth Circuit has continued to apply the "background circumstances" test, and this court is bound by such precedent. *See, e.g., Arendale,* 519 F.3d at 603. Regardless, Plaintiff's argument is moot because the Court finds that "background circumstances" do exist.

However, that finding alone is not sufficient to establish a prima facie case of reverse discrimination. The Court must analyze the second prong of *Murray* to determine whether the Plaintiff has alleged facts sufficient to "show[ ] that the employer treated differently employees who were similarly situated but not members of the protected group." *Murray,* 770 F.2d at 67.

> In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [minority] employees who he alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances.

*Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994). However, plaintiff's showing does not have to be one of "exact correlation with the employee receiving more favorable treatment." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir.1998). Courts consider whether the plaintiff and the employees with whom he compares his treatment "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992).

The Defendant points to the investigation report of Dennis Williams as evidence that some African–Americans also had problems with Sheila Odom. (D.E. No. 26–3, at 3.) Williams interviewed Arnell Mann, an African–American female, who stated that she had twice been offended by Odom. She reported being told "Shut up! I'm talking!" by Odom in front of co-workers, and described Odom as "no[t] like any manager [she'd] ever had." (D.E. No. 26–2 at 10.) In contrast, other employees who Williams interviewed characterized Ms. Odom as a "good supervisor" and "one of the best." (*Id.*) Williams' report reveals conflict with Odom among both African–American and Caucasian employees and casts doubt on the Plaintiff's claim that he was exposed to disadvantageous terms and conditions of employment that employees of other races were not.

Furthermore, the Court notes that several differences exist in the Plaintiff's employment status compared to other employees. Other employees were stationed in the Brownsville office full time, while the Plaintiff only worked in Brownsville one day per week. The Plaintiff was in his first year as an employee at Pathways. He was also the only person in the Brownsville office qualified to treat patients with some insurance carriers. Similarly, the Plaintiff was the most highly-educated employee working in Brownsville, even more so than Director Odom.

Most importantly, Cooper has not attempted to present evidence establishing that similarly-situated African–American employees received better treatment than he did. Although Plaintiff generally alleges that he "was exposed to disadvantageous terms or conditions of employment to which employees, who were of a different race, were not exposed," he fails to point to any specific African–American employees who were similarly-situated and received better treatment. Without a more specific showing, the Plaintiff has failed to create a genuine issue of fact for trial. *See Fuelling v. New Vision Med. Lab., LLC,* 284 Fed.Appx. 247, 255 (6th Cir.2008) (ruling that plaintiff failed to create a genuine issue of fact for trial where she "identified only one black employee

... [b]ut ... provided no information about [the employee]-such as her position, job responsibilities, years of experience, length of tenure at [the employer], or disciplinary history-that would indicate whether [they] were similarly situated in all relevant aspects of their employment"). Without a showing "that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [minority] employees who he alleges were treated more favorably," Plaintiff has not established a prima facie case of reverse discrimination and the claim cannot survive summary judgment. *Pierce,* 40 F.3d at 802.

### III. Hostile Work Environment

[14] Cooper also argues that Odom's discriminatory harassment created a hostile work environment. Title VII is violated "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

> In order to establish a prima facie case of hostile work environment based on race under Title VII, a plaintiff must show: 1) that he is a member of a protected class; 2) that he was subjected to unwelcome racial harassment; 3) that the harassment was based on race; 4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and 5) the existence of employer liability.

*Newman v. Fed. Express Corp.,* 266 F.3d 401, 405 (6th Cir.2001). In reverse discrimination cases such as this where the plaintiff is the member of a majority group, the plaintiff need not show that he is member of a protected class but rather "prove 'background circumstances [to] support the suspicion that the defendant is the unusual employer who discriminates against the majority.'" *Arendale,* 519 F.3d at 604–05 (quoting *Sutherland v. Mich. Dep't of Treasury,* 344 F.3d 603, 614 (6th Cir.2003)). As noted in the previous section, Cooper has proven sufficient background circumstances.

A hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In determining whether alleged harassment is sufficiently severe or pervasive to rise to the level of a "hostile work environment," the Court must look at the "totality of the circumstances." *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 562 (6th Cir.1999) (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367). Pursuant to this test, "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Id.* Relevant factors within this analysis include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463 (6th Cir.2000). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275

(quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). The determination of whether harassing conduct is severe or pervasive is "quintessentially a question of fact." *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir.2006) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir.1999)).

■ The Plaintiff's complaints of harassment by Odom fall into two categories: 1) those related to the performance of his job responsibilities, and 2) those related to being referred to with racially derogatory terms. The Court will first consider those about the performance of his job responsibilities. The Plaintiff has stated a number of ways in which Odom made the performance of his job responsibilities more difficult. Included among those are: failure to involve him as a staff member, disagreement over what time he should report to work, being asked to return his office key without reason, making an inappropriate comment in front of a client, interference with his treatment of clients, instructing other office staff not to speak with him for non-business reasons, refusal to discuss client intakes on two occasions, and being asked to complete Odom's own work. Although Plaintiff's allegations certainly paint the picture of an unpleasant work situation, that alone is not sufficient to make out a Title VII claim. "Title VII does not create a 'general civility code' in the workplace; it forbids racially motivated harassment." *Arendale*, 519 F.3d at 606 (quoting *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275). The fact that the Plaintiff has alleged that he was harassed by Odom does not prove a prima facie case of a hostile work environment. The Plaintiff must also prove that Odom's harassment was motivated by race.

In his deposition, the Plaintiff stated that aside from being referred to as "whitey" and "white boy," he didn't know whether any of Odom's other conduct towards him was motivated by race. (Depo. of Cooper 32, D.E. No. 26–4.)

> The primary thing I would hear, of course, was race. The other things I cannot tell you whether it was directly tied to the race, like the work stuff.
>
> . . .
>
> As far as—but as far as I can't tell you whether she came in there and threw that chart down on me because I was white, because she didn't like me, because of what. I can't tell you.

(*Id.*) Plaintiff has also acknowledged that he was warned by the Dyersburg staff that Odom would view him as a threat to take her position because of his qualifications. (*Id.* at 13.) Without a further showing that Odom's conduct was motivated by race, the Court cannot consider those allegations in finding a prima facie case of hostile work environment. The incidents alleged by Plaintiff are racially neutral on their face. They paint the picture of a personality conflict and disagreement over how the office operated but lack the racial nexus that is required to find an actionable hostile work environment.

The remaining allegations relate to Odom referring to the Plaintiff with racially derogatory terms. In previous cases of hostile work environment based on racially derogatory comments, the Sixth Circuit has stated that a plaintiff may not merely make conclusory assertions as to the frequency of the comments. *See Fuelling v. New Vision Med. Labs., LLC*, 284 Fed. Appx. 247, 259 (6th Cir.2008). Rather, the plaintiff's allegations must be accompanied "by specific instances of racial comments to support [his] claim that they occurred so frequently as to be severe or pervasive, and give . . . indication of the time, place, or context of the remarks." *Id.* In *Fuelling*, the court determined that the plaintiff could not establish a prima facie case of

hostile work environment where "she failed to present any evidence to substantiate her conclusory assertions that the remarks occurred 'numerous' times, 'often,' or 'regularly' during her two-year tenure." *Id.*

In the instant case, Cooper alleges that Odom referred to him as "whitey" or "white boy" on every visit to Brownsville. (Depo. of Cooper 19, D.E. No. 26–4.) However, the only instance that Plaintiff points to of Odom using a racial remark is an occasion where she allegedly met him in the office parking lot and told him to "get [his] white ass out of [his] fine car." (*Id.*) One reported episode of allegedly racially derogatory language is not sufficient to establish that Odom's comments were severe and pervasive. As well, the Plaintiff's assertion that Odom made racial comments every time he visited Brownsville is conclusory and non-specific. Without more, the Plaintiff has not created a genuine issue of material fact as to the severity or pervasiveness of Odom's alleged racially derogatory language. *See Fuelling,* 284 Fed.Appx. at 259–60 (granting summary judgment on hostile work environment claim where plaintiff alleged that she was referred to with derogatory language "on numerous occasions" but was only able to identify the speaker on one occasion); *Crawford v. Medina Gen. Hosp.,* 96 F.3d 830, 836 (6th Cir.1996) (finding no hostile work environment where only two comments were actually discriminatory); *Fasone v. Clinton Twp.,* No. 97–3267, 1998 WL 165147, at *1 (6th Cir. Apr. 3, 1998) (hostile work environment claim failed where plaintiff alleged "constant harassment" but only identified "a few specific discriminatory comments"); *see also Ladd v. Grand Trunk W. R.R., Inc.,* 552 F.3d 495, 501 (6th Cir.2009) ("[Plaintiff] has alleged that she was subject to derogatory sex-based comments on a daily basis, but without specifics it is difficult to adjudge their severity.").

In summary, the Defendant has made a number of allegations of harassing behavior by Sheila Odom toward him. However, almost all are racially neutral and suggest a general personality conflict between the two and disagreement over how the Brownsville office was run. The Plaintiff has failed to present evidence that Odom's alleged actions were motivated by his race. Further, Cooper's remaining complaint that Odom made racially derogatory comments to him lacks the specificity in time, place, and context to create a general issue of material fact. Thus, the Defendant's motion for summary judgment on the Plaintiff's hostile work environment claim is granted.

### IV. Constructive Discharge

Cooper finally argues that the harassment he endured from Odom was so severe and pervasive that it led to his constructive discharge. Although he does not expressly state it, the Plaintiff's contention, which amounts to a claim for constructive discharge based upon a hostile work environment, is one under Title VII recognized by the Supreme Court in *Pennsylvania State Police v. Suders,* 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). To prevail on a constructive discharge allegation based on a hostile work environment, the plaintiff "must show [not only] harassing behavior 'sufficiently severe or pervasive to alter the conditions of [his] employment,'" *id.* at 133, 124 S.Ct. 2342, but also "that the abusive working environment became so intolerable that [his] resignation qualified as a fitting response." *Id.* at 134, 124 S.Ct. 2342. "In other words, workplace harassment that is severe and pervasive enough to create a hostile work environment may in some circumstances constructively discharge the employee." *Plautz v. Potter,* 156 Fed. Appx. 812, 819 (6th Cir.2005).

The bar for proving constructive discharge is higher than that for a hostile work environment claim, as "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Suders*, 542 U.S. at 149, 124 S.Ct. 2342. The plaintiff must show something more. *Id.* at 147, 124 S.Ct. 2342. "Working conditions for constructive discharge must be even more egregious than those that would support a finding of a hostile work environment; absent extraordinary circumstances, an employee is expected to remain employed while seeking redress." *Witte v. Wis. Dep't of Corr.*, 434 F.3d 1031, 1035–36 (7th Cir.2006).

█ Because the Court has already held that Cooper has not alleged facts sufficient to prove that he suffered a hostile work environment, it is not necessary to analyze his hostile work environment constructive discharge claim. Cooper's contention is predicated on the same facts as his hostile work environment claim, and the constructive discharge claim likewise fails. *See Plautz*, 156 Fed.Appx. at 819 ("We have already decided that the complained of actions do not rise to the level of creating a hostile work environment, and therefore they necessarily do not rise to the level of compelling a reasonable person to resign."); *Campbell v. CCL Custom Mfg., Inc.*, No. 03–2789B, 2006 WL 222814, at *9 (W.D.Tenn. Jan. 30, 2006) ("Because Plaintiff's claim for hostile work environment, on which his assertion of constructive discharge is based, fails, so too must his claim for constructive discharge."). Defendant's motion for summary judgment on Cooper's constructive discharge claim is granted.

### V. Conclusion

For the reasons stated herein, the Court **GRANTS** the Defendant's motion for summary judgment as to Cooper's reverse discrimination, hostile work environment, and constructive discharge claims.[4]

---

4. Defendant JMCGHD has further argued that it is entitled to summary judgment because the Plaintiff submitted his resignation before it had completed its investigation into the discrimination and before it had an opportunity to correct any discriminatory behavior. Relatedly, JMCGHD argues that it cannot be held liable because it had no notice of the allegedly discriminatory behavior. The Court need not address those issues. The Court's finding that the Plaintiff is unable to prove a prima facie case of reverse discrimination, hostile work environment, or constructive discharge dictates that judgment be entered in favor of the Defendant.